Filed 2/23/17 (after order vacating prior opn.)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B258587 |
| | (Super. Ct. No. F493872) |
| Plaintiff and Respondent, | (San Luis Obispo County) |
| v. | OPINION FOLLOWING ORDER |
| | VACATING PRIOR OPINION |
| RONALD J. COWAN, | |
| Defendant and Appellant. | |

The prosecutor achieved a victory at trial, but it was a Pyrrhic victory. The gain of a conviction at trial led to a loss on appeal.

In rebuttal, during closing argument, the prosecutor told the jury, "Let me tell you that presumption [of innocence] is over. Because that presumption is in place only when the charges are read. But you have now heard all the evidence. That presumption is gone." She buttressed this grossly inaccurate explanation of reasonable doubt with the erroneous statement that the jury's decision regarding defendant's guilt is just an ordinary decision people make "a hundred times a day."

A prosecutor may not mislead jurors with false and misleading statements concerning the law. This disreputable

tactic lightens the prosecutor's burden and threatens the integrity of our system of justice.

On August 24, 2016, our Supreme Court granted Cowan's petition for review. It transferred Cowan's appeal to us with directions to vacate our opinion and reconsider the cause in light of *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*).

In light of *Centeno*, the prosecution's win-at-all-costs strategy pushed this case over the precipice of reversal. (*Centeno, supra*, 60 Cal.4th 659.) The trial court read to the jury the proper instruction concerning reasonable doubt, among other numerous instructions. The court told the jury that its instructions prevail if there are conflicts between its instructions and counsel's arguments. But this was before the prosecutor argued to the jury her misguided version of reasonable doubt. The court's earlier instruction was insufficient to overcome the prejudice the prosecutor's grossly improper argument bought to the minds of the jurors. The prosecutor's definition was the last explanation of reasonable doubt the jury heard.

At that moment the trial judge would have been well advised to inform the jurors that the prosecutor had misstated the law and to again read to the jurors the reasonable doubt instruction. We offer this suggestion not as a rule to follow in every case when counsel misrepresents the law or evidence. In the extreme case, however, when the law is so misrepresented that the case is likely infected with prejudicial error, the trial court must intercede to ensure a fair trial.

We caution prosecutors to observe and respect the law and not rely on harmless error as a safety net to ensure a conviction. The integrity of our system of justice demands nothing less.

A jury found Ronald J. Cowan guilty of one count of sodomy of a person under age 10 (Pen. Code, § 288.7, subd. (a)[1]); two counts of oral copulation with a person under age 10 (§ 288.7, subd. (b)); and two counts of lewd acts on a child (§ 288, subd. (a)). The jury also found true that both counts of lewd acts on a child involved substantial sexual conduct. (§ 1203.066, subd. (b).) The trial court sentenced Cowan to 65 years to life. We reverse.

## FACTS

Cowan had a relationship with a woman named Keena. After the relationship ended, Cowan continued to visit Keena's family. He paid particular attention to Keena's younger brother D., who was then eight years old. He bought D. clothes and other gifts and took him on outings. D. and his friends stayed overnight at Cowan's home.

When D. became a teenager, Cowan turned his attention to D.'s cousin, A.J., who was born in November 2007. A.J. lived with his mother, his grandmother, and periodically with his grandfather.

Cowan would visit A.J. five times a week for hours at a time. He would bring him gifts every week and took him places. Between the time A.J. was two and four, Cowan was alone with him on more than 10 occasions.

When A.J. was three or four, he spent the night at Cowan's home. Cowan called A.J.'s mother to tell her he was bringing A.J. back because he was crying. Cowan returned A.J. between 11:30 p.m. and midnight. When A.J. got home, he could not stop crying. He kept touching his buttocks and saying it

---

[1] All statutory references are to the Penal Code unless otherwise stated.

3

hurt. A.J.'s mother and grandmother thought A.J. might have a rash. A.J.'s mother put diaper rash cream on him, but she saw no sign of anything wrong. It took several hours for A.J. to fall asleep.

In March 2012, A.J.'s mother was incarcerated and lost custody of her children. A.J., who was four and one-half years old, and his two-year-old sister were placed in foster care with C.C. A.J. lived with C.C., her husband and children for 18 months.

Within days of A.J.'s arrival, C.C. noticed A.J. exhibited sexualized behavior. A.J. was playing with toys and said, "I want to sex you." He would frequently do pelvic thrusting. Almost every time he got into the bathtub, he played with his penis. He would rub his bottom on people, the furniture and the wall.

C.C. first met Cowan at a social services meeting about a week after A.J. was placed with her. Cowan asked if he could take care of A.J. and his sister part-time. The person running the meeting said he would consider it. In the parking lot after the meeting, Cowan came up to C.C. Cowan was teary-eyed and said he missed A.J. He gave her some toys for A.J.

On another occasion, Cowan walked up to C.C. teary-eyed, said that he missed A.J. and really wanted to see him. He asked C.C. if she could arrange a visit. C.C. told Cowan it was against social services' rules. Cowan told C.C. that he was a mentor for boys. He used to be in the Big Brothers program, but now he was doing it on his own.

C.C. said Cowan was present almost every time A.J.'s mother had unsupervised visits with her children. A.J.'s mother had two visits a week. She also saw Cowan at A.J.'s birthday

4

party.  C.C. said, "[Cowan] was there at every possible visit he could be."

On the night of the birthday party, C.C. was putting A.J. to bed when he asked if he could sleep in her bed.  When C.C. said no, A.J. told her that he had been in Cowan's bed.  She asked A.J. why he was in Cowan's bed.  A.J. said because there was nowhere else to sleep.  When C.C. asked what they were wearing, A.J. replied that they were both wearing pajamas, but Cowan's pants fell down.

Shortly thereafter, one of C.C.'s sons reported that he and his brothers were in their bedroom with A.J.  They were talking about school when A.J. blurted out, "[A] guy named Ron put his wiener in [my] butt."  C.C. talked to A.J. the next morning.  A.J. confirmed that what he said the previous night was true.  C.C. called A.J.'s social worker to report what A.J. said.  While C.C. was waiting for the social worker to return her call, she put A.J. down for a nap.  One of C.C.'s sons walked into the room and A.J. said, "Ron put his wiener in my butt."

The social worker returned C.C.'s telephone call and told her to call the police.  The police interviewed A.J. and took him for a physical examination.

C.C. spoke with A.J. on the evening after the physical examination.  She asked A.J. if he ever touched Cowan's "wiener" or if Cowan had touched his.  A.J. said Cowan put A.J.'s penis in his mouth and let A.J. touch his penis.  A.J. said it happened at Cowan's house.

C.C. testified A.J. frequently lied.  When she would see him do something wrong, he would lie and deny he did it.  His eyes would dart all around the room when he lied.  When he told her about what Cowan did, his demeanor was different.  He was

very serious, humble and calm. She believed A.J. was telling the truth.

A.J.'s mother testified that after she completed a substance abuse program, Cowan helped her get an apartment so she could get her children back. Cowan purchased furniture, food, clothes and toys for the children. At one point Cowan asked A.J.'s mother, if he stayed the night, "what if [A.J.] wanted to sleep in the same bed [with] him." She replied that if Cowan stayed the night he would have to sleep on the couch.

A.J.'s grandmother testified that her husband sometimes watches pornography. The pornography does not involve children. A.J. saw the pornography for a period of seconds before grandmother's husband turned it off.

Grandmother's husband testified that A.J. would turn on the pornography and view it for about five minutes before he told him to turn it off.

District Attorney Investigator Tracy Nix interviewed A.J. twice. The interviews were recorded and the recordings were played for the jury.

A.J. told Nix that Cowan put his "pee pee in [his] butt." A.J. said that it felt disgusting and that his penis felt like a hard baseball bat. Using two anatomical dolls, A.J. demonstrated what Cowan had done to him. A.J. also said that he and Cowan had touched each other's penises. After the interview, A.J. took two anatomically correct dolls and had one orally copulate the penis of the other. In the second interview, A.J. described acts of oral copulation that Cowan had committed.

A.J. was physically examined by Dr. Niska Abdul-Cater, an expert in evaluating child sexual abuse. She found no physical signs of abuse. She testified, however, that there are

6

often no signs of sexual trauma in the anal area.  Even when the victim is examined within 72 hours, findings are made in only 5 to 30 percent of the cases.  Oral copulation generally leaves no physical signs.

A.J. testified at trial.  He was six years old at the time.  At first he denied remembering speaking to Nix.  Then he said he spoke to her about Cowan, and told her the truth.  A.J. also initially denied Cowan did anything to him.  But when asked if Cowan "put his pee-pee in [his] butt at some point," A.J. said yes; it happened at Cowan's house and made him feel "[n]ot comfortable."  A.J. said Cowan did nothing else to his private parts.  After the recording of A.J.'s interview with Nix was played before the jury, A.J. said he told Nix the truth.

DEFENSE

Cowan denied the allegations.  He said he had been in the court-appointed special advocate program, but he decided to leave the program and mentor D. on his own.  There was less paperwork.

D. had been at his home alone one time.  A few other times, D. and his friends slept at his house.  When D. was around 17 years old and A.J. was two, Cowan started to spend more time with A.J.

A.J. had been to Cowan's home only twice.  Once was with his mother.  The other time they planned for A.J. to spend the night.  There was a bedroom on the third floor of Cowan's house.  A.J. had been there on the night of the sleepover.  Cowan watched television with A.J., but later A.J. started whining and wanted to go home.  Cowan could not calm him, so he called A.J.'s mother and took him home.

Cowan helped A.J.'s mother get an apartment so that she could get her children back from foster care. Cowan never asked A.J.'s mother about sleeping in the same bed as A.J.

Dawn Clove knew Cowan because her son was one of D.'s friends. Her son spent time with Cowan. She trusted Cowan and did not believe he did what he was accused of doing.

Raymond Glove testified he has known Cowan for 10 years and has seen him interact with children. He does not believe Cowan would do anything sexually inappropriate with children.

Doris McIntyre had been Cowan's neighbor for 28 years. She had seen him interact with children in her family. She does not believe he would have committed the charged offenses.

A forensic computer expert testified he recovered approximately 20,000 images from Cowan's computer hard drives. There was some adult pornography. But there was no child pornography.

DISCUSSION

Cowan contends the prosecutor committed misconduct in closing argument by misstating the presumption of innocence and the burden of proof. We agree.

It is improper for the prosecutor to misstate the law, and in particular to attempt to reduce the People's burden of proof beyond a reasonable doubt. (*People v. Marshall* (1996) 13 Cal.4th 799, 831.) Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness that it denies the defendant due process. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Even where the improper comments fall short

8

of this test, they may constitute misconduct under state law if they involve the use of deceptive or reprehensible methods in an attempt to persuade the court or jury. (*Ibid.*)

If a charge of prosecutorial misconduct is based on a prosecutor's argument to the jury, the appellate court must consider whether there is a reasonable likelihood the jury construed or applied any of the challenged statements in an objectionable manner. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.) The court must consider the challenged statements in the context of the argument as a whole to make its determination. (*Ibid.*)

The prosecutor argued the most basic tenet of criminal law. She told the jury that the presumption of innocence is in place "only when the charges are read" and that the "presumption is gone" thereafter.

The presumption of innocence is a fundamental component of a fair trial under our system of criminal justice. (*Estelle v. Williams* (1976) 425 U.S. 501, 503.) The presumption of innocence continues during the taking of testimony and during jury deliberations until the jury reaches a verdict. (*People v. Arlington* (1900) 131 Cal. 231, 235.)

It is misconduct to misinform the jury that the presumption of innocence is "gone" prior to the jury's deliberations. It strikes at the very heart of our system of criminal justice. Even a novice prosecutor should know not to make such a fallacious statement to the jury.

The People argue that Cowan did not preserve the issue by failing to object and request an admonition. But Cowan objected that the prosecutor was misstating the law. That is sufficient to preserve the issue. The defendant is not required to

9

use the word "misconduct" in raising the objection. The trial court did not sustain the objection, but told the jury "this is argument," and cautioned the jury only to consider its instructions.

The People argue the prosecutor's comments here were similar to those declared not to be misconduct in *People v. Booker* (2011) 51 Cal.4th 141. There the prosecutor told the jury: "'I had the burden of proof when this trial started to prove the defendant guilty beyond a reasonable doubt, and that is still my burden. It's all on the prosecution. I'm the prosecutor. That's my job.' [¶] 'The defendant was presumed innocent until the contrary was shown. That presumption should have left many days ago. He doesn't stay presumed innocent.'" (*Id.* at p. 183.)

In rejecting the contention that the remarks constitute misconduct, our Supreme Court stated: "Although we do not condone statements that appear to shift the burden of proof onto a defendant (as a defendant is entitled to the presumption of innocence until the contrary is found by the jury), the prosecutor here simply argued the jury should return a verdict in his favor based on the state of the evidence presented." (*People v. Booker*, *supra*, 51 Cal.4th at p. 185.)

But here the prosecutor did not simply argue that the presumption of innocence had been overcome by the evidence. Instead, she told the jury the presumption ends with the reading of the charges. To put it another way, even before the evidence is received, the presumption of innocence disappears. This is an unfair attempt to lighten the prosecution's burden of proof and constitutes misconduct.

The People's reliance on *People v. Cortez* (2016) 63 Cal.4th 101 to show there was no misconduct is misplaced. In

*Cortez*, during his rebuttal argument, the prosecutor stated: "'The court told you that beyond a reasonable doubt is not proof beyond all doubt or imaginary doubt. Basically, I submit to you what it means is you look at the evidence and you say, "I believe I know what happened, and my belief is not imaginary. It's based in the evidence in front of me."'" (*Id.* at p. 130.) Defendant's counsel objected that the prosecutor misstated the law. Before the court could rule on the objection, the prosecutor added, "'That's proof beyond a reasonable doubt.'" (*Ibid.*) The majority of our Supreme Court concluded the prosecutor's statement, taken in context, did not constitute misconduct.

The prosecutor's statement in *Cortez* is far less inimical to the presumption of innocence than the prosecutor's statement here that the presumption of innocence is in place only up to the time the charges are read. The majority in *Cortez* described the prosecutor's remarks as an "incomplete" statement of the law. (*People v. Cortez*, *supra*, 63 Cal.4th at p. 135.) The prosecutor's statement here was not incomplete, it was completely wrong.

Not every argument by the prosecution constituted misconduct requiring reversal. Cowan assigns as misconduct the prosecutor's statement that the jury must make a decision "[j]ust like you make decisions a hundred times a day throughout your day. That's what you are going to do. And you are going to use the standard of beyond a reasonable doubt using your reason." Cowan cites *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36, where the court strongly disapproved of arguments suggesting the beyond-a-reasonable-doubt standard is used in everyday life.

But a claim of prosecutorial misconduct is reviewable only if the defendant makes a timely objection at trial and

11

requests the trial court to admonish the jury to disregard the impropriety. (*People v. Sapp* (2003) 31 Cal.4th 240, 279.) Here Cowan neither objected nor requested an admonition. Under the circumstances, the matter is reviewable only if the admonition would not have cured the harm. (*Ibid.*) Any harm could have been cured by an admonition.

Cowan also cites as misconduct the prosecutor's argument:

"Beyond a reasonable doubt simply means that . . . after consideration of all the evidence in totality you're firmly convince[d] that guilt is the only reasonable interpretation of the evidence.

"What makes sense? Isn't it reasonable to conclude that Ronald Cowan who likes to surround himself with young boys; whom he pries away from working mothers who don't have a lot of time; whom he bribes with gifts, toys, money; whom he bribes their families with toys, and gifts and money and sporting events and sporting workout clothes, isn't reasonable to believe that the defendant committed these crimes. It's not because he's creepy, it's because he did these things.

"Isn't it reasonable to base your decision to convict Ronald Cowan on the fact that he lavishes the boys with this affection[?] He was obsessed with [D.] as he told you. [D.] got too old to him, so he switched to A.J. . . .

"Isn't it a reasonable interpretation that A.J. came home with a sore bottom because the defendant had sodomized him? [A.J.] was crying because his trusted friend had betrayed him by molesting him? Isn't a reasonable interpretation of the evidence to believe that this man [had so much access to A.J.] and to convict this man because he had so much access . . . ; isn't

12

it reasonable to convict him of these crimes? And isn't it reasonable after all, like I pointed out to believe that this man, who has this cavalier attitude about sex. . . . [i]s [the] same man who has the attitude towards A.J. and A.J. told you what he was thinking. . . [?] Isn't it reasonable to believe that the same man who had that attitude from the stand is this man who didn't care what A.J. thought and who took from A.J. what he wanted[?]"

The prosecutor made a similar argument in *Centeno*, *supra*, 60 Cal.4th 659. The prosecutor told the jury: "'[Y]our decision has to be in the middle. It has to be based on reason. It has to be a reasonable account. . . . [Y]ou need to look at the entire picture, not one piece of evidence, not one witness . . . to determine if the case has been proven beyond a reasonable doubt.'" (*Id.* at p. 671.) She then asked the jury to consider the following: "'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.* [¶] Is it reasonable to believe that Jane Doe is lying to set-up the defendant for no reason or is the defendant guilty?'" (*Ibid.*) She continued: "'Is it reasonable to believe that there is an innocent explanation for a grown man laying on a seven year old? No, that is not reasonable. Is it reasonable to believe that there is an innocent explanation for the defendant taking his penis out of his pants when he's on top of a seven-year-old child? No, that is not reasonable. Is it reasonable to believe that the defendant is being set-up in what is really a very unsophisticated conspiracy led by an officer who has never met the defendant *or he*[*'s*] *good for it? That is what is reasonable. He's good for it.*'" (*Id.* at pp. 671-672.) Our Supreme

Court concluded it was error for the prosecutor to suggest that a reasonable account of the evidence satisfies the prosecutor's burden of proof. (*Id*. at p. 672.)

Unlike the prosecutor in *Centeno*, the prosecutor here prefaced her remarks with the statement that beyond a reasonable doubt means "you're firmly convince[d] that guilt is the only reasonable interpretation of the evidence." That is an accurate statement of the meaning of beyond a reasonable doubt. (See CALCRIM No. 224, stating in part: "[B]efore you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.") The prosecutor made the statement immediately before discussing what is reasonable. The jury would understand the prosecutor's discussion of the reasonable interpretation of the evidence to be linked to her statement that the jury must be firmly convinced that guilt is the only reasonable interpretation of the evidence. But the prosecutor told the jury reasonable doubt ends when the case begins.

We acknowledge that the prosecution evidence here is stronger than that in *Centeno*. Cowan showed an obsessive interest in victim A.J. He would visit A.J. five times a week for hours at a time; he would bring him gifts and take him places. When A.J. was placed in foster care, Cowan asked if he could take care of A.J. part-time. He tearfully approached A.J.'s foster mother, C.C., and asked if he could visit A.J.

When A.J. spent the night at Cowan's house, Cowan brought him home crying late at night. A.J. kept touching his buttocks and saying it hurt. It took A.J. several hours to fall

14

asleep. Thereafter, A.J. blurted out to C.C.'s sons that "a guy named Ron put his wiener in his butt."

Cowan points out that A.J.'s testimony was inconsistent about what occurred. But A.J. was only six years old when he testified. Most adults would find it difficult to testify about sexual matters in front of a jury, no less a six-year-old.

Cowan claims A.J. learned about sex while observing his grandfather watch pornography. But Cowan brought A.J. back to A.J.'s mother's house after spending the evening alone with Cowan. A.J. was crying inconsolably and complaining that his buttocks hurt. That was not the result of viewing pornography and appears to be consistent with A.J.'s spontaneous statement that "a guy named Ron put his wiener in his butt."

Evidence that supported the defense include Cowan pointing out that C.C. testified A.J. frequently lied. Initially, C.C. did not know whether to believe A.J. when he told her what Cowan had done. But C.C. also testified that, after speaking with A.J., she became convinced he was telling the truth. A.J. did not behave as he did when he was lying.

In *Centeno*, the main thrust of the opinion was the prosecutor's use of a diagram showing the geographical outline of California. *Centeno* pointed out that "[c]ourts have repeatedly cautioned prosecutors against using diagrams or visual aids to elucidate the concept of proof beyond a reasonable doubt." (*Centeno*, *supra*, 60 Cal.4th at p. 662.) The prosecutor argued that, even if the evidence of what the diagram showed was filled with inconsistencies, omissions and inaccuracies, the jury would have no reasonable doubt that the state was California. Our Supreme Court determined that the presentation constituted

15

misconduct.  It invited the jury to conclude without evidence that the diagram showed the state of California and failed to reflect the evidence in the case, which was "far from definitive."  (*Id*. at p. 670.)

Here the prosecutor's inaccurate definition of reasonable doubt left in the minds of the jurors an image as graphic as a map.  This was the last explanation about reasonable doubt the jury heard.

In *Centeno*, prejudice arising from misconduct required reversal.  Our Supreme Court pointed out that the prosecutor's presentation did not directly contradict the trial court's instruction on proof beyond a reasonable doubt.  (*Centeno*, *supra*, 60 Cal.4th at p. 676.)  But here the prosecutor's misconduct did.

The judgment is reversed.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

We concur:


YEGAN, J.


PERREN, J.


16

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.