Filed 11/10/20  P. v. Rocco CA5
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTINE MARIE ROCCO,<br><br>  Defendant and Appellant. | F074772<br><br>(Super. Ct. No. 1416930)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Joseph R. Distaso, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, Jennifer Oleksa and Clara Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant Christine Marie Rocco was convicted by a jury of second degree murder in violation of Penal Code section 187, subdivision (a), for the death of her infant daughter, A.J.[1] The trial court sentenced Rocco to an indeterminate term of 15 years to life in state prison.

On appeal, Rocco argued that the prosecutor committed prejudicial error by misstating the law during closing argument. Specifically, Rocco contended that the prosecutor inaccurately stated the elements of implied malice as it applies to second degree murder. Additionally, Rocco filed supplemental briefing addressing whether she should be eligible for pretrial mental health diversion under then-newly enacted section 1001.36. (Stats. 2018, ch. 34, § 24, pp. 34–37.) In an unpublished opinion, we concluded the prosecutor did not err but even if we assumed error, it was harmless and did not deprive Rocco of due process or a fair trial. We also concluded that section 1001.36 was not intended to apply to defendants such as Rocco who had been convicted, sentenced and incarcerated for years. (*People v. Rocco* (Jan. 22, 2019, F074772) [2019 Cal.App.Unpub. Lexis 467].)

The California Supreme Court granted Rocco's petition for review and after issuing a decision in *People v. Frahs* (2020) 9 Cal.5th 618 (*Frahs*), the court transferred the case back to us on August 19, 2020, with directions to vacate our opinion and reconsider the cause. (*People v. Rocco*, review granted Apr. 24, 2019, S254264.) In accordance with the California Supreme Court's order, we vacate our opinion and following reconsideration of the matter in light of *Frahs*, we conclude that pursuant to section 1001.36, subdivision (b)(2)(A), Rocco's conviction for murder categorically excludes her from consideration for placement in a diversion program. We reject Rocco's contrary argument and again affirm the judgment.

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

2.

# FACTUAL BACKGROUND

On January 11, 2009, a Stanislaus County Sheriff's Deputy responded to Rocco's residence following a 911 call reporting the death of a child. Paramedics led the deputy to a bedroom where an infant, A.J., was on the floor under a blanket. The deputy uncovered the infant and observed abrasions on her stomach and that she appeared discolored and emaciated. A.J.'s eyes were open and appeared to be glazed over or dried, rigor mortis was present, and her skin was very gray and scaly. The deputy observed that the bedroom was disheveled with trash, boxes and soiled diapers on the floor. There was no apparent heat source in the room, and the room was chilly.

Law enforcement officers interviewed Rocco. She stated that she had been feeding A.J. 16 ounces of formula every hour and a half to two hours, but was recently only able to feed her four to six ounces per feeding. She explained that A.J. had been drinking less during her feedings, had lost weight and was suffering from diarrhea. Rocco admitted that A.J. had a bad rash for several weeks and had diarrhea for about two months. She laid A.J. on the floor of the room around midnight, and then went to sleep in another room and did not check on her until 8:00 a.m. She said that A.J. had been having three or four diapers a day full of diarrhea. The deputy observed bottles of milk in the room, two partially full cans of formula, and an empty bottle of Pedialyte.

A forensic pathologist conducted A.J.'s autopsy. The doctor observed that A.J. was very emaciated, the skin all over her body was dehydrated and wrinkly, she had no subcutaneous fat tissue and very little muscle, and her ribcage was very prominent. A.J. weighed less than six pounds, both eyes were sunken in from dehydration, and her eyeballs were pale, indicating there was not much blood in her system. A.J.'s heart, lungs and liver were smaller than normal for a baby her age due to malnutrition and dehydration. A.J. had a severe diaper rash on her genitalia, buttocks, and abdomen. The rash had become infected, and there was a decubitus ulcer near the buttocks that was covered in stool. The pathologist explained that type of ulcer usually developed from a

lack of circulation when the body does not change position for prolonged periods of time. There were nine grams of a curdled milk substance in A.J.'s stomach and a moderate amount of feces in her large intestine, indicating that she had been recently fed. The pathologist concluded that A.J. died from sepsis due to a diaper rash that was infected, and that contributing factors in her death included malnutrition, starvation and dehydration. In her opinion, A.J. had been neglected for a long period of time.

A pediatric doctor testified as an expert in child abuse. A.J. weighed 7 pounds, 2 ounces at birth. At her eight-day checkup, A.J. weighed 6 pounds, 15 ounces; however, some weight loss during the first week was normal. Rocco did not bring A.J. for her one-month checkup, and no other records indicated her weight after her one-week appointment. A.J. was just above the 25th percentile for weight when born, but at the time of her autopsy she weighed less and was "way below the lowest percentile," for infants her age, which was very abnormal. If she had continued to grow and gain weight normally, A.J. should have weighed around 11 pounds, 4 ounces at the time of her death. The doctor noted that Rocco's account of the amount that she was feeding A.J. did not sound accurate. Newborns typically consume two to three ounces every two to three hours and could not consume the amounts Rocco was allegedly feeding her. The doctor agreed with the pathologist that, in his medical opinion, A.J. died from extreme neglect that occurred over at least several weeks.

The doctor explained that a reasonable, competent person would have realized that A.J. was in critical need of medical care. Even though there was evidence that A.J. was being fed some food, a restricted diet over a long period of time could still lead to death by starvation. A social worker tried to reach Rocco multiple times to schedule a visit as part of an investigation, but had difficulty reaching her. Rocco answered the social worker's telephone call but said that it was not a convenient time to talk. During the investigation, Rocco agreed to voluntarily place her older son in foster care.

In her defense, Rocco presented evidence that she suffered from psychological conditions that prevented her from taking appropriate actions regarding A.J.'s care. A clinical psychologist testified for the defense. He met with Rocco and conducted a psychological evaluation and assessment. He opined that Rocco suffered from persistent depressive disorder and posttraumatic stress disorder (PTSD). The psychologist believed that Rocco had the symptoms of clinical depression, and probably had suffered from depression since childhood. Rocco was molested for much of her childhood by a family friend. She reported the molestation to her parents multiple times; however, they did not believe her. The psychologist opined that Rocco's parents' actions exacerbated the trauma, which was the probable cause of her PTSD. Symptoms of her PTSD included an inability to concentrate, constantly feeling anxious, and avoidance of things that would remind her of her trauma as they were likely anxiety provoking. As her parents were essentially unavailable to assist with her trauma, the psychologist described that Rocco had developed what he termed "learned helplessness," where she felt helpless to get herself out of bad situations, which made her very ineffective in dealing with challenging life situations. Rocco had attempted suicide at the age of 10 years old and began cutting herself, but the actions were not noticed by her parents. She began overeating, using drugs, engaging in sexual activity with older men and was the victim of domestic violence in at least two of her relationships.

The psychologist asserted that the above psychological factors of symptomatic avoidances, numbing, inattention, and learned helplessness resulting from her PTSD and depression contributed to Rocco's inability to properly attend to A.J.'s medical needs. While Rocco would have the ability to recognize the need to call 911 for assistance if she observed a car accident, due to her mental state she was unable to recognize the grave physical state of her daughter. Because of these issues, the psychologist testified that Rocco "found all kinds of reasons not to act" in response to her daughter's condition, and that she was "overly optimistic" since her son had previously overcome similar issues.

5.

The psychologist also discussed Rocco's state of mind after A.J's death. After A.J. died, Rocco started drinking heavily and had suicidal thoughts. He opined that Rocco missing appointments with the social worker was an example of her ineffective way of coping with problems and challenges in her life and that her ability to function was even worse when she was stressed, which was part of her problem.

## DISCUSSION

### I.      Prosecutorial Error

Rocco's main defense at trial was that while she was responsible for the death of A.J., she should have been found guilty of the lesser offense of voluntary manslaughter, rather than second degree murder, because she acted without implied malice. Second degree murder requires a showing of implied malice, which she argued she lacked because, due to her psychological state, she did not have the subjective awareness that her conduct was dangerous to human life. On appeal, Rocco argues that the prosecutor committed prejudicial error by misstating the law as applied to implied malice and misleading jurors during rebuttal argument that the defense's argument was based on a mistaken understanding of the law. Specifically, she argues that the prosecutor misstated the law when she told the jury that implied malice did not require a showing of subjective awareness. Upon review, we find it is unclear from the record whether the prosecutor misstated the law or intended to mislead the jury. Regardless, even if error occurred, we conclude there was no prejudice to Rocco.

### A.      Relevant Facts

#### 1.      Jury Instructions Given

At the close of trial, defense counsel requested that the jury be provided a pinpoint instruction from *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*), which stated that "[i]mplied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence" and that it depends on a determination "that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard." (*Id.* at pp. 296, 297.)

6.

The court declined to give that instruction, finding that the form jury instruction CALCRIM No. 520 "gives a good definition of the difference between malice aforethought and criminal negligence between the second degree murder and the lesser-included involuntary manslaughter, I think the [instruction is] sufficient and appropriate, so I'm not going to give the pinpoint instruction per … *Watson*."

The court told defense counsel that she could not reference that specific case, but that she could use whatever demonstrative language she wanted to describe the legal concepts described in *Watson*, *supra*, 30 Cal.3d 290.

The jury was instructed pursuant to CALCRIM No. 520. With regard to mental intent required to be found guilty of murder, the instruction states, in relevant part, as follows:

> "When [Rocco] acted, she had a state of mind called malice aforethought[.] [¶] … [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] [Rocco] acted with *express malice* if she unlawfully intended to kill. [¶] [Rocco] acted with *implied malice* if: [¶] 1. She intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time she acted, she knew her act was dangerous to human life; AND [¶] 4. She deliberately acted with conscious disregard for human life.

> "Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] … [¶]

> "An act causes death if the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is a natural and probable, consider all of the circumstances established by the evidence."

Jury instructions also described how mental disorders could be taken into consideration to determine whether Rocco possessed the required mental state required to show implied malice. The jury was instructed with CALCRIM No. 3428, which states, in part:

> "You have heard evidence that [Rocco] may have suffered from a mental disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, [Rocco] acted or failed to act with the intent or mental state required for that crime."

The jury was also instructed that a mistake of fact could negate the requisite mental intent to convict Rocco of second degree murder pursuant to CALCRIM No. 406:

> "[Rocco] is not guilty of murder if she did not have the intent or mental state required to commit the crime because she did not know a fact or mistakenly believed a fact.

> "If [Rocco's] conduct would have been lawful under the facts as she believed them to be, she did not commit murder.

> "If you find that [Rocco] believed that she needed the medical cards before she could use medical services or that she mistakenly believed that [A.J.'s] condition would improve, she did not have the specific intent or mental state required for murder.

> "If you have a reasonable doubt about whether [Rocco] had the specific intent or mental state required for murder, you must find her not guilty of that crime."

Finally, the court explained to the jury that the difference between murder and involuntary manslaughter is "whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. [¶] An unlawful killing caused by a willful act done in the full knowledge and awareness that the person is endangering the life of another and done in conscious disregard of that risk is murder."

### 2. Closing Arguments and the Court's Admonishment to the Jury

The prosecutor's primary argument during closing was that Rocco knew her daughter's life was at risk and, based on her conscious disregard of that risk, she was

guilty of murder. The prosecutor explained that the evidence indicated that Rocco had the requisite implied malice to be found guilty of second degree murder:

> "What we have is implied malice, and that requires that she intentionally failed to act, the natural and probable consequences were dangerous to human life., that she knew failing to act was dangerous to human life, and that she acted with conscious disregard for human life. [¶] … [¶]

> "She knew her failure was dangerous to human life. This was not minutes. This was not like, 'Oh, I had no idea sepsis got into the diaper rash and she's dead.' This took weeks, days and weeks of starving to death, of being immobile. So her knowing that her failure was dangerous to human life, because it happened over a long period of time, and she watched that child slowly die. She failed to act with conscious disregard to human life—"

Moreover, the prosecution spent significant time arguing that the theories presented by the psychologist as to why Rocco was less capable of appreciating the risks due to her mental conditions were not convincing and should be disregarded.

Defense counsel responded by presenting closing argument focused on negating the mental intent required to prove implied malice for purposes of second degree murder. She used the terminology from *Watson* that "implied malice in this case … is a subjective awareness of a higher degree of risk than … criminal negligence and involves an element of wantonness which is absent in criminal negligence." (See *Watson*, *supra*, 30 Cal.3d at p. 296.) She described the word subjective as "the awareness of that particular person, his or her awareness." She described that malice required "an actual or subjective appreciation of risk" and that you have "to act deliberately in conscious disregard, not just conscious disregard, your act has to be deliberate, and there has to be an element of wantonness in it."

In rebuttal, the prosecutor responded by pointing out that the jury instruction used different language to describe the implied malice than that stated by defense counsel. She stated:

9.

> "You took an oath to follow the law. The law comes from the Judge. You have an instruction [CALCRIM No.] 520, it's in your packet. Nowhere in this instruction, nowhere in the law does it say the word subjective. Nowhere in this instruction does it say the word wanton."

Defense counsel objected that the prosecutor's argument was a misstatement of the law, a sidebar discussion occurred, and the court overruled the objection. The prosecutor then continued, saying again that the words "subjective" and "wanton" were not in CALCRIM No. 520:

> "[CALCRIM No.] 520 is the second degree murder instruction. The word subjective is not in the instruction. What the instruction says—and the word wanton is not in the instruction. What the instruction says is at the time she acted, she knew her act was dangerous to human life.
>
> "So there is an element of assessing her knowledge that calls for the question of reasonableness. Do you believe that her PTSD prevented her from knowing the actual risk? I can't stand here and say, 'Well, I'm not guilty of murder because I didn't think pushing you off the roof would kill you.' There is an element of reasonableness to her belief that she knew her act was dangerous, in this case her failure to act was dangerous to human life. That is your evaluation. The word subjective, the word wanton is not in this law.
>
> "Where you see a reasonable person is natural and probable consequences, is one that a reasonable person would know. That is also in [CALCRIM No.] 520. Does not say subjective."

The prosecutor concluded by stating that Rocco consciously disregarded A.J.'s life, that her failure to act was intentional and, therefore. she was guilty of murder.

Immediately following the prosecutor's rebuttal argument, the court provided the following advisement to the jury:

> "Folks, here's what I'm going to do: Just because it came up in counsel's arguments, I'm going to do this, because you need to follow the law as I've instructed you.
>
> "What the attorneys say in their arguments is not evidence … they'll argue the law as they see it, but you have to follow what the instructions say, okay? So, that's what I'm going to give you on that.

> "But basically the issue, and this is what you need to consider, I'm going to read … first off from second degree murder with malice aforethought, I'm going to read you the definition of implied malice, all right?  So here's the definition from the instruction, this is what you will get in the jury room."

The court then re-read CALCRIM Nos. 520, 3428, 3406, and 582, instructing the jury for a second time on the required elements for second degree murder with malice aforethought, the ability of a mental impairment or mistake of fact to negate the requisite mental state, and the difference between murder and involuntary manslaughter.

Following closing arguments, defense counsel moved for a mistrial, claiming prosecutorial error and alleging that the prosecution's statement in rebuttal misstated the law.  Defense counsel explained that, when discussing the instructions to be used, while the court did not alter or amend the instructions for implied malice, the court agreed that defense counsel could use the legal terminology from *Watson*, *supra*, 30 Cal.3d 290 to describe the legal standard for implied malice.  Defense counsel argued that she gave the right law on murder:

> "For the jury to be led to believe that there is no subjective element in implied malice when you're discussing murder is a misstatement and misleading statements by [the prosecutor].  She knowingly made them because, first of all, she had notice of those cases, secondly, we discussed them in court, thirdly, I objected to it before she went there at sidebar today during her closings.
>
> "We asked the Court to declare a mistrial because she has misled them on the most important part of the law as the defense's case.  The law is correct as argued.  There was no comment when I was arguing that this misstates the law by [the prosecutor].  There was no ruling by the Court that I had misstated the law.  To then raise it in rebuttal so that I cannot get up and argue, and the Court overrules me, I believe has damaged us beyond redemption."

The prosecutor responded that she never told the jury that the defense's statement of the law was incorrect but explained that "the word subjective is not in the instruction, and that is a true statement, it is not."

The court denied the motion for mistrial, finding that there had been no prosecutorial error. The court specifically relied on the use of jury instructions, stating that the attorneys' arguments are not the law and that the jury must follow the law as instructed by the court. The court was satisfied that the jury was properly instructed and denied the motion for mistrial.

**B.** **Law Regarding Prosecutorial Error**

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.[']" (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 822–823 & fn. 1, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it involves "'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" (*People v. Harrison*

(2005) 35 Cal.4th 208, 242.) "[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall* (1996) 13 Cal.4th 799, 831; accord, *People v. Centeno* (2014) 60 Cal.4th 659, 665–667.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]'" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.) The court must consider the challenged statements in the context of the argument as a whole to make its determination. (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159 (*Cowan*).)

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) In the absence of a due process violation, reversal for prosecutorial error is not warranted unless there is a reasonable probability a result more favorable to the defendant would have been reached without the error. (*Crew*, *supra*, 31 Cal.4th at p. 839.) "[O]nly misconduct that prejudices a defendant requires reversal [citation], and a timely admonition from the court generally cures any harm." (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.)

### C.    Analysis

Rocco contends that the prosecution misstated the law as applied to implied malice by arguing that it does not require a showing of the subjective appreciation of the risk involved.

13.

Implied malice has both an objective and a subjective test.  The objective test requires ""'"an act, the natural consequences of which are dangerous to life .…."'"" (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*), quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587.)  This means an act involving "'a high degree of probability that it will result in death.'"  (*Knoller*, *supra*, at p. 152.)  "The *subjective* test requires that the act be performed ""'by a person who knows that his conduct endangers the life of another.'"""  (*People v. Cravens* (2012) 53 Cal.4th 500, 516, quoting *Knoller*, *supra*, at p. 143 (dis. opn. of Kennard, J.).)  CALCRIM No. 520, as provided to the jury, defined implied malice as having four elements that contained both objective and subjective elements.  The second element was that the natural and probable consequences of the act were dangerous to human life, and that a natural and probable consequence is one a reasonable person would know is likely to happen.  That test required an objective showing that a reasonable person would know that death was a likely result of the act.  However, once the second element was met, the third element provided for the requirement that at the time of the act, the defendant knew the act was dangerous to human life.  Accordingly, the third element required proof that the defendant subjectively knew that the actions were dangerous to human life.

During her initial closing argument, the prosecution properly stated the correct standard for implied malice directly from the jury instruction.  She set forth the four elements listed in the jury instruction for implied malice, including elements two and three that the natural and probable consequences were dangerous to human life and that Rocco knew that failing to act was dangerous to human life.  The prosecution emphasized how Rocco knew that her failure to care for A.J. was dangerous to human life because the neglect took place over a long period of time, and that Rocco watched A.J. slowly die.  Based on A.J.'s condition of being nearly skeletal, with sagging skin and sunken eyes for an extended period of time, the prosecution argued that there would be no way to ignore the needs of the child without conscious disregard for her life.

Moreover, apart from discussing the jury instructions and standards required for proving implied malice, the prosecution spent a significant portion of her closing argument describing why Rocco knew her failure to act was dangerous to human life despite her experts attempting to explain why, due to her mental conditions, she was not capable of acting appropriately in such a situation. The prosecution argued that there was no way to ignore the physical state of A.J. for such a long period of time without conscious disregard for her life, and asked that the jury reject the arguments set forth by the psychologist regarding learned helplessness and unresolved PTSD. The prosecutor argued that Rocco was not psychotic, delusional, hallucinating or unconscious. She asserted Rocco was conscious and aware of the situation yet failed to act. Based on the fact that Rocco knew the consequences of her inaction, the prosecution argued that Rocco acted with a conscious disregard and was, therefore, guilty of murder rather than a lesser offense.

Defense counsel, in presenting her argument regarding implied malice, relied on statements of law from *Watson*, *supra*, 30 Cal.3d 290 and referred to the term "subjective awareness" and discussed the concept of wantonness repeatedly. She also provided a written slideshow to the jury, which, in addition to providing the language of CALCRIM No. 520, discussed the definition of wantonness and subjective appreciation of the risk.

As noted, the trial court allowed defense counsel to use whatever terminology she saw fit to describe the standard for implied malice and was correct in doing so. The Supreme Court has held that the "'wanton disregard for human life'" definition of implied malice "would be understood by a reasonable juror to independently require a finding of the defendant's subjective awareness of the life-threatening risk" and that it was not error to instruct the jury with such language. (*People v. Dellinger* (1989) 49 Cal.3d 1212, 1221 (*Dellinger*).) However, the court also noted that "the term is not in common use in contemporary daily speech, and there remains the possibility that many laypersons will be unfamiliar with its meaning." (*Ibid.*) As such, the court found that

15.

"[t]he better practice in the future is to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice" as provided in the jury instruction. (*Ibid*.) "[T]he 'conscious disregard for human life' definition, standing alone, is 'more comprehensible to the average juror.'" (*Id.* at p. 1222.)

In rebuttal, the prosecution noted that CALCRIM No. 520 did not use the word "subjective" or the word "wanton." Rather, the prosecution noted that the instruction says that "at the time she acted, [Rocco] knew her act was dangerous to human life." What the prosecution stated was technically correct and, as described in *Dellinger*, the jury instruction purposefully omitted the terminology used by defense counsel in an attempt to clarify the instruction for the jurors. (See *Dellinger*, *supra*, 49 Cal.3d at pp. 1221–1222.) However, regardless of the terminology used, the legal standard is the same. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104 ["[T]he two definitions of implied malice which had evolved from the foregoing cases actually articulated one and the same standard."].) Therefore, it is unclear what the prosecution was attempting to differentiate between the language used by defense counsel and that contained in the jury instruction. While the prosecution's statement was accurate that the terms used by defense counsel were not in the instruction, it was also somewhat misleading to the extent that the prosecution implied that defense counsel was attempting to apply law not found in the instructions.

While the prosecution's argument was not a model of clarity, Rocco's contention that the prosecution was attempting to argue that implied malice did not contain a subjective component is not accurate either. Immediately after stating that CALCRIM No. 520 did not contain the terms "wanton" or "subjective," the prosecution stated that implied malice required a showing that at the time Rocco acted, she knew her act was dangerous to human life. Accordingly, after stating that the instruction did not use the terms described by defense counsel, the prosecution accurately stated the subjective

16.

element required for proving implied malice, using the terminology found in the jury instruction.

The prosecution appeared to also attempt to differentiate the subjective and objective components of implied malice in her rebuttal argument. After stating that CALCRIM No. 520, the instruction for implied malice, required that Rocco "*knew* her act was dangerous to human life," she went on to explain that there "*is an element* of assessing her knowledge that calls for the question of reasonableness." (Italics added.) The prosecution went on to describe the part of the implied malice instruction involving natural and probable consequences and what a reasonable person would know, and how it did not require proving the subjective knowledge of Rocco. That too is a correct statement of the law.

Rocco argues that the statements from the prosecution meant to inform the jury that they were not allowed to consider her subjective state of mind, and that it "was a devastating statement which undermined the defense, was legally false, went against the trial court's earlier ruling, and which left the impression with the jury that defense counsel had tried to mislead them by misstating the law." While we find the prosecution's statements generally confusing, we are unable to find that the prosecution's conduct rose to the level of deceptive or reprehensible conduct that undermined the fairness of the trial. Rather than attempt to differentiate the terminology used by defense counsel, it would have been beneficial for the prosecutor to explain to the jury that the terminology used by the parties was interchangeable, and that there was only one standard for proving implied malice. However, the prosecution's repeated use of the proper standard for the subjective element of implied malice undermines Rocco's argument that the prosecution was attempting to misstate the law. To the extent that the comments confused the jury, the confusion would be regarding what the prosecutor was attempting to argue, not whether the standard for implied malice required a subjective awareness of the risk, which it was clear from the instructions that it did.

17.

Additionally, Rocco focuses on several comments made by the prosecution during rebuttal. However, when viewed in the context of the prosecution's argument as a whole, there is even less likelihood that the jury would interpret the comments in the manner suggested by the defense. The prosecution spent significant time discussing the evidence presented, including evidence relating to the defense's theory that implied malice could not be shown because Rocco was unable to properly assess the dire condition of A.J. based on the effects of PTSD and depression. Based on the overall argument presented by the prosecution that Rocco's mental impairments did not prevent her from knowing that her neglect posed a danger to A.J.'s life, the jury would not have interpreted the statements in the prosecution's rebuttal in a manner that caused them to misapply the law. (*Cowan*, *supra*, 8 Cal.App.5th at p. 1159.) Based on the totality of the prosecution's arguments, we find that, although the statements were confusing, it was not prosecutorial error.

Assuming arguendo the prosecutor's statements regarding the standard for implied malice were erroneous, a defendant's conviction will not be reversed for such error unless it is reasonably probable a result more favorable to the defendant would have been reached without the error—the standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Crew*, *supra*, 31 Cal.4th at p. 839; accord, *People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

As described above, the prosecutor stated that the instruction did not contain the legal terminology used by defense counsel. However, the overall focus of the prosecutor's argument was that A.J. was severely malnourished for such a long period of time that her condition would have been obvious to Rocco, who, through her continued neglect of A.J., acted with conscious disregard for human life.

Furthermore, the trial court properly instructed the jury and immediately admonished the jury after rebuttal argument that, although the attorneys would argue the law as they saw fit, the jury was required to follow what the jury instructions stated. The

court then re-read the relevant jury instructions regarding implied malice in a further attempt to prevent any confusion. CALCRIM No. 520 unequivocally advised the jury that the prosecution had to prove that at the time Rocco acted, that she knew her act was dangerous to human life. Jurors are credited with intelligence and common sense. We presume they generally understand and follow the instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670; accord, *People v. Holt* (1997) 15 Cal.4th 619, 662.)

Rocco has failed to establish it is reasonably probable a result more favorable to her would have been reached without the alleged prosecutorial error. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836; accord, *Crew*, *supra*, 31 Cal.4th at p. 839; *People v. Barnett*, *supra*, 17 Cal.4th at p. 1133.) Reversal under the federal Constitution is necessary only when the conduct infects the trial with such unfairness as to make the resulting conviction a denial of due process. (*People v. Salcido* (2008) 44 Cal.4th 93, 152.) The prosecution's statements during rebuttal argument did not deprive Rocco of due process or a fair trial.

## II.     Eligibility for Pretrial Mental Health Diversion

### A.     Background

Rocco was convicted of the 2009 murder of her daughter on May 20, 2016, and she was sentenced to prison on November 4, 2016. While Rocco's appeal was pending, the Legislature added section 1001.36 to the Penal Code, effective June 27, 2018. (Stats. 2018, ch. 34, § 24, pp. 34–37.) Pursuant to section 1001.36, certain defendants suffering from mental disorders may be eligible for pretrial diversion (*id.*, subds. (a), (b)), which is defined as "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment[]" (*id.*, subd. (c)). "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion…." (*Id.*, subd. (e).)

In our prior opinion, we concluded that relief under section 1001.36 was not available to defendants like Rocco who had been convicted, sentenced and incarcerated for years.  Subsequently, the California Supreme Court held in *Frahs* that the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) applies to section 1001.36 and the statute is retroactive to all judgments not yet final.  (*Frahs*, *supra*, 9 Cal.5th at pp. 624–625, 634 ["[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'"].)  However, relevant here, the Legislature amended section 1001.36, effective January 1, 2019, to categorically exclude certain defendants from eligibility for diversion based on the charged offense, specifically those charged with murder or involuntary manslaughter, certain sexual offenses, or offenses relating to weapons of mass destruction.  (§ 1001.36, subd. (b)(2), added by Stats. 2018, ch. 1005, § 1, pp. 1–5.)[2]

Given the conclusion in our prior opinion, we did not reach Rocco's argument concerning the subsequent amendment to section 1001.36 that categorically excluded defendants charged with certain offenses from eligibility for diversion.  That issue, which was not addressed in *Frahs*, is now squarely before us.  (*Frahs*, *supra*, 9 Cal.5th at p. 640.)

In accordance with *Frahs*, *supra*, 9 Cal.5th at pages 624–625, Rocco argues that section 1001.36 applies retroactively to this case, but she maintains that because the subsequent amendment restricting eligibility is not ameliorative, it is presumed to operate prospectively under section 3.  In addition, she argues that application of the amendment in this case would result in an ex post facto violation.  The People take the position that because section 1001.36 is retroactive, so too are the "corrective amendments," as

---

**2**     Section 1001.36 was subsequently amended a second time, effective January 1, 2020, to make nonsubstantive technical corrections.  (Stats. 2019, ch. 497, § 203, pp. 328–332.)

"clear[ly]" intended by the Legislature, and that application of the amendment does not violate ex post facto principles. We agree with the People, and the Courts of Appeal in *People v. McShane* (2019) 36 Cal.App.5th 245 (*McShane*) and *People v. Cawkwell* (2019) 34 Cal.App.5th 1048 (*Cawkwell*), that the amendment to section 1001.36 applies in this case and categorically excludes Rocco from eligibility for relief under section 1001.36, but we do not adopt the People's reasoning with respect to their undeveloped retroactivity argument.

### B.     Analysis

As Rocco argues, "[n]o part of [the Penal Code] is retroactive, unless expressly so declared." (§ 3.) "[T]he language of section 3 erects a strong presumption of prospective operation[]" (*People v. Brown* (2012) 54 Cal.4th 314, 324; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 880), but under the rule articulated in *Estrada*, "an amendatory statute lessening punishment for a crime [is] presumptively retroactive and applied to all persons whose judgments were not yet final at the time the statute took effect" (*Frahs*, *supra*, 9 Cal.5th at p. 624, citing *Estrada*, *supra*, 63 Cal.2d at p. 745). The *Estrada* rule has been extended "to legislation that mitigate[s] the possible punishment for a class of persons[]" (*Frahs*, *supra*, at p. 624, citing *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303), and in *Frahs*, the court applied the rule to legislation that "by design and function provides a possible ameliorating benefit for a class of persons[]" (*Frahs*, *supra*, at p. 624).

The People cite no authority for their puzzling assertion that because section 1001.36 as enacted applies retroactively, the amendment is also necessarily retroactive. The People do not argue that the amendment to section 1001.36 is also ameliorative and, therefore, the *Estrada* rules applies, nor could they. They assert that the Legislature clearly intended retroactive application, but the assertion is conclusory and not supported by *any* citation to statutory text or legislative history. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364 ["If a party's briefs do not

21.

provide legal argument and citation to authority on each point raised, "'the court may treat it as waived, and pass it without consideration.'"'"].)

We are similarly unpersuaded by Rocco's argument that because the amendment to section 1001.36 presumptively operates prospectively, it cannot be applied in this case to her crime committed prior to its enactment. Rocco's broad argument assumes that "a law is being applied retrospectively if it is applied to the prosecution of a crime committed before the law's effective date." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 (*Tapia*).) This is not necessarily so; "it is the law's effect, not its form or label, which is important." (*Id.* at p. 289.) Here, Rocco committed her crime in 2009, years before section 1001.36 was conceived of and enacted, and the corrective amendment to section 1001.36 categorically excluding certain defendants from eligibility under the recently enacted statute addresses not Rocco's past criminal act or punishment for that act, but a diversion hearing that has yet to be held. (*Tapia*, *supra*, at p. 288.) The pertinent question in such circumstances is whether the amendment "'change[s] the legal consequences of an act completed before [the law's] effective date,' namely the defendant's criminal behavior[]" or "violate[s] the constitutional rule against ex post facto legislation." (*Ibid.*, quoting *Weaver v. Graham* (1981) 450 U.S. 24, 31.)

"'[W]hether a new law is being applied retrospectively is closely intertwined with the question whether it is an unconstitutional ex post facto law, because a finding that the law is being applied retrospectively is a threshold requirement for finding it impermissibly ex post facto.'" (*McShane*, *supra*, 36 Cal.App.5th at p. 260, quoting *In re E.J.* (2010) 47 Cal.4th 1258, 1276.) "'The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime.'" (*McShane*, *supra*, at p. 260, quoting *In re Vicks* (2013) 56 Cal.4th 274, 287 (*Vicks*).) "Therefore, it is 'aimed at laws that "retroactively alter the

definition of crimes or increase the punishment for criminal acts." [Citations.]'" (*Vicks*, *supra*, at p. 287.)[3]

"[A]n ex post facto violation does not occur simply because a criminal defendant loses '"substantial protections"' [citation], or suffers some '"disadvantage"' after the crime occurs[]" (*People v. Ansell* (2001) 25 Cal.4th 868, 884, citing *Collins v. Youngblood* (1990) 497 U.S. 37, 50–51; accord, *Tapia*, *supra*, 53 Cal.3d at p. 294.) Rather, "'"'any statute [1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.'"'" (*Tapia*, *supra*, at p. 294, fn. omitted, quoting *Collins v. Youngblood*, *supra*, at p. 42.) The amendment to section 1001.36 "neither makes criminal an act innocent when committed nor increases the punishment for that act[]" (*People v. White* (2017) 2 Cal.5th 349, 360), and the two published opinions considering this issue in the context of the amendment to section 1001.36 reached the same conclusion (*McShane*, *supra*, 36 Cal.App.5th at p. 260; *Cawkwell*, *supra*, 34 Cal.App.5th at p. 1054).[4]

Rocco relies on *People v. Perez* (1998) 68 Cal.App.4th 346 (*Perez*), abrogated on another ground by *People v. Mazurette* (2001) 24 Cal.4th 789, 796, for the proposition that "[r]etrospective application of new or amended diversion statutes that adversely affect defendants has been held to violate the prohibition against ex post facto laws." The change in the law at issue in *People v. Perez*, however, concerned a statutory amendment to a diversion program that conditioned deferred entry of judgment in certain drug cases

---

[3] The ex post facto clauses of the federal and California Constitutions "provide[] the same protections and [are] analyzed in the same manner .…" (*Vicks*, *supra*, 56 Cal.4th at p. 287.)

[4] The California Supreme Court granted review in *McShane*, *supra*, 36 Cal.App.5th 245 and *Cawkwell*, *supra*, 34 Cal.App.5th 1048 pending a decision in *Frahs*, *supra*, 9 Cal.5th 618. The court dismissed the petitions for review on August 26, 2020.

on *entry of a guilty plea*, which was not required under the prior version of the statute. (*Perez*, *supra*, at pp. 350–352.) The court in *Perez* concluded that the diversion statute at issue was analogous to a probation statute and made "punishment more burdensome than the applicable punishment at the time of commission of the alleged conduct." (*Id.* at p. 356.) To avoid a possible ex post facto application, the court interpreted the amendment to apply only prospectively. (*Id.* at pp. 356–357.) As the Court of Appeal noted in *Cawkwell*, the prior version of the diversion statute that did not require entry of a guilty plea was in existence at the time the defendant in *Perez* committed his crime. (*Cawkwell*, *supra*, 34 Cal.App.5th at p. 1054, fn. 5.) "[C]ases are not authority for propositions not considered" (*People v. Brown*, *supra*, 54 Cal.4th at p. 330), and given these distinctions, we are not persuaded that *Perez* is informative in this context.

Based on the foregoing, we reject Rocco's arguments that application of the amendment to section 1001.36 in this case is necessarily retrospective and an impermissible ex post facto law. Under the circumstances here, the amendment to section 1001.36 applies and Rocco is categorically ineligible to seek diversion under the statute given her 2016 murder conviction. (§ 1001.36, subd. (b)(2)(A).)

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

HILL, P.J.

POOCHIGIAN, J.

24.