Filed 12/4/25  P. v. Leslie CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081715 |
| v. | (Super.Ct.No. FVI20000947) |
| STEPHEN ROWELL LESLIE II, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Miriam I. Morton, Judge.  Affirmed in part; reversed in part with directions.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Stephen Rowell Leslie II of committing numerous sexual offenses against his minor stepdaughter and daughter, along with one count of the unlawful purchase or receipt of a firearm while subject to a protective order (Pen. Code, § 29825, subd. (a) (§ 29825(a))) and other offenses related to his attempts to evade law enforcement and resist arrest after his daughter reported the abuse. (Unlabeled statutory references are to the Penal Code.)

On appeal, Leslie argues that his trial counsel rendered ineffective assistance by failing to move to sever the trial on the firearm offense. He also argues that the trial court erroneously instructed the jury on the elements of that offense, providing them with the elements of a similar but uncharged misdemeanor. The People concede the instructional error, and we agree. Leslie also argues that (1) the firearm offense as charged is not supported by sufficient evidence, (2) the trial court committed several prejudicial evidentiary errors, and (3) the prosecution committed prejudicial misconduct during closing argument. We reverse the conviction on count 18 because of the instructional error. We also find the evidence insufficient to support a conviction on the charged offense, so the charge cannot be retried. We otherwise affirm.

BACKGROUND

Leslie was born in 1978. He married Araceli R. in 2008. Leslie and Araceli had two daughters: Jane Doe C. (born in November 2006) and Jane Doe M. (two years younger than Doe C.). Araceli had two older children: Jane Doe V. (born in December 1997) and Marcus S. (two years younger than Doe V.).

2

I.    *Doe C. reports that Leslie sexually abused her*

Doe V., her boyfriend, and her children visited with her family (Araceli, Leslie, Doe C., and Doe M.) for about two weeks in March and April 2020. Doe V. was then 22 years old. During the visit, Doe C. overheard a telephone conversation between Doe V., her boyfriend, and his mother, in which Doe V. was talking about having been sexually assaulted by Leslie. Doe C., who was then 13 years old, subsequently told Doe V. that Leslie was sexually abusing her. Doe V. drove home the next day, told Marcus what happened, and asked him to tell Araceli, which he did on April 20 by calling her at work.

After work, Araceli took Doe C. and Doe M. to Araceli's friend's house to spend the night. She lied to Leslie and the girls, telling them that her friend wanted to spend time with the girls. As Doe C. was packing to leave, Leslie walked in and mouthed to her, "Don't tell anyone." While driving to the friend's house, Araceli asked Doe C. if Leslie sexually abused her. Asked at trial how she responded to the question, Doe C. testified that she told Araceli "the truth." Araceli dropped off Doe M. at her friend's house and took Doe C. to the emergency room.

San Bernardino County Sheriff's Deputy Kyle Shuler interviewed both Doe C. and Araceli at the hospital. Doe C. said that Leslie last sexually abused her on the previous day. According to Shuler, Doe C. described what happened during the most recent incident as Leslie inserting his penis into her vagina and her orally copulating him.

Shuler had Doe C. make two pretext phone calls to Leslie, in which she accused him of having sex with her. Leslie denied the allegations.

3

II.     *The initial investigation*

After Araceli and Doe C. left the hospital, they went to Araceli's friend's house, where they arrived after midnight. Leslie was calling and texting Araceli, but she did not want to speak with him. Within one hour of their arrival, Araceli's friend noticed Leslie's car parked in front of the residence, and she called 911. Araceli's friend said that everyone was afraid. According to the friend, Araceli was "fairly certain that there were weapons in the car." Leslie incessantly called Araceli, Doe C., and Doe M., asking them to go outside to talk to him.

Araceli testified that she did not tell her friend anything about Leslie having firearms. Araceli testified that she knew that Leslie had firearms while they were together, but she also recanted and said that she was "really not sure about guns." Araceli explained that Leslie did not have "a complete gun" but instead had parts from which firearms could be built.

After leaving the hospital, Shuler went to the family's residence, but Leslie was not there. Shuler called Araceli and asked where Leslie might be. Araceli told Shuler that she could hear Leslie's car approaching her friend's residence, so Shuler went there. When Shuler arrived, Leslie was no longer there, but Leslie called Araceli while she was talking to Shuler. At Shuler's instruction, Araceli answered the call and asked Leslie to meet her at the friend's house, where Shuler waited.

4

When Shuler saw Leslie's car approaching the house, Shuler activated the emergency lights on his marked patrol car. Leslie pulled his car alongside the patrol car, faced in the opposite direction. Shuler instructed Leslie to stop, but Leslie refused. Leslie "yelled, Fuck you" and fled the scene. Leslie led Shuler on a high-speed chase for approximately one and one-half miles, until Leslie crashed into the wash alongside the road. Another deputy then arrived at the scene.

Shuler instructed Leslie to get out of the car, but Leslie refused. Shuler had been informed that Leslie might have firearms. Leslie attempted to reach over to grab something in the passenger seat, so Shuler grabbed Leslie's left hand or wrist. Leslie continued to refuse to get out of the car and punched another deputy in the face. The deputies eventually removed Leslie from the car and handcuffed him.

Shuler and another deputy searched Leslie's car after a tow truck pulled it out of the wash. They found assault rifle magazines, hundreds of rounds of rifle and pistol ammunition, the lower frame of a Glock pistol without a serial number, and a loaded "personally manufactured" "AR style rifle" without a serial number. Shuler explained that he considered the rifle a "personally manufactured firearm" that was put together from various procured parts, "where you don't have to go through a DOJ or licensed firearm dealer to, you know, make the rifle." As for the pistol, Shuler explained that the lower receiver is the frame where the trigger assembly and several other parts are normally located, but the lower receiver recovered from Leslie's car did not have a barrel or a slide.

5

A San Bernardino County supervising deputy district attorney testified that Leslie was the restrained party named in a 10-year criminal protective order that was issued in December 2010 and expired in December 2020. She explained that criminal protective orders are restraining orders "issued in criminal cases to protect a protected party usually from the defendant in the case." The protective order provided: "Any person subject to a protective order is prohibited from owning, possessing, purchasing, or attempting to purchase, receiving or attempting to receive, or otherwise obtain a firearm."

III. *The charged offenses*

In 2023, Leslie was charged by amended information with committing 10 sexual offenses against Doe C. and Doe V. when they were less than 14 years old. (§§ 288, subd. (a) [lewd and lascivious act], 269, subds. (a)(1) [forcible rape], (a)(3) [forcible sodomy], (a)(4) [forcible oral copulation], (a)(5) [forcible sexual penetration]; counts 1-10.) He also was charged with committing four sexual offenses against Doe V. when she was a minor more than 14 years old. (§§ 261, subd. (a)(2) [forcible rape], 286, subd. (c)(2)(C) [forcible sodomy and oral copulation], 289, subd. (a)(1)(C) [forcible sexual penetration]; counts 11-14.) Six of the offenses contained special allegations that Leslie committed a qualifying sex offense against multiple victims under the one strike law. (§ 667.61, subd. (e)(4).)

The information also alleged that Leslie committed the following offenses: (1) assault on a peace officer (§ 245, subd. (c); count 15), (2) felony evasion of a peace officer (Veh. Code, § 2800.2, subd. (a); count 16), (3) felony resisting arrest (§ 69; count

6

17), and (4) "unlawfully purchas[ing] and receiv[ing] and attempt[ing] to purchase and receive a firearm knowing that he was prohibited from doing so by a temporary restraining order, by an injunction, and by a protective order" in violation of section 29825(a) (count 18).

IV.    *Testimony of Doe C.*

Doe C. was 16 years old when she testified at trial. She testified that Leslie frequently sexually abused her when she was between 10 and 13 years old. Leslie put his penis inside her vagina about twice per week during that period. He also licked Doe C.'s vagina, sucked on her breasts, made her suck on his penis, put his penis inside her anus once, and tried but failed to put his penis inside her anus on another occasion. After the first incident of sexual abuse, in which Leslie penetrated Doe C.'s vagina with his penis, Leslie instructed Doe C. not to tell Araceli or anyone about what happened. He later told her that she would get in trouble if she told anyone. Doe C. recalled the details of only "a handful" of incidents.

Doe C. struggled against Leslie on numerous occasions, including the first incident, but Leslie overpowered her. She stopped resisting altogether when she was around 12 years old, because she "knew it wasn't going to stop." Doe C. feared Leslie and described him as "very violent." She explained: Leslie "is way stronger than me when I was little, like, and just I know his strength because he hit me a lot and stuff," "beat [her]" and Doe M. "a lot," and "suffocated [Doe C.] one time with a pillow" when she was 12 or 13 years old. Doe C. feared that Leslie would "go after [her] like kill [her]

7

or beat [her] if [she] told anybody."  She also feared for the safety of Marcus and Doe M., because Leslie acted violently toward them.  Doe C. and Doe V. did not call the police after talking to each other about the abuse because they were afraid of Leslie.

The last incident of sexual abuse occurred the day before Leslie got arrested.  Doe C. testified that she orally copulated Leslie, and he ejaculated.  She initially testified that Leslie did not vaginally penetrate her during that incident, but she later testified that she could not recall.  Asked whether she recalled telling a law enforcement officer that Leslie did put his penis inside her vagina during that incident, Doe C. testified, "I think he did.  There's too many times where it is either he made me suck on it, and then he would make me ride his penis.  And then other times it would just be me sucking on it."

V.      *Forensic examination of Doe C.*

Laura Hiday is a forensic pediatric nurse practitioner who conducted a sexual assault exam of Doe C. the day after she told Araceli about the abuse.  Hiday explained that an exam generally includes a comprehensive physical examination, including the genitals, a history of the reported abuse, photographs, collection of swabs for DNA, and screenings for sexually transmitted infections and pregnancy.  When Hiday testified at trial in June 2023, she had worked in her position for six and one-half years and "performed this specific exam with regard to reported sexual assault more than a thousand times."

Hiday testified that she received a bachelor of science degree in nursing in 2008 and a master's degree in 2011. She is licensed as a registered nurse and a nurse practitioner and is certified as a pediatric sexual assault examiner and a pediatric nurse practitioner. She has received pediatric nurse practitioner training, including formal training and on-the-job training, and additional training specific to forensics. She has also "received ongoing peer review and training with mentors in this [pediatric sexual assault examiner] field, including forensic pediatricians, an additional examiner specific to this type of case." Hiday explained that she was part of a peer review group conducted at a local children's hospital, in which she would get together with other medically trained forensic teams, including six doctors, three nurse practitioners, and one nurse. They would review their cases, including photographs, along with "the current studies and literature."

Hiday's examination of Doe C. resulted in a "normal exam." Hiday explained that "a normal exam means that in [Doe C.'s], or this specific medical exam, I did not see any old injury or new injury. And that when we screened for infection, that as a preliminary result came back normal." Hiday opined that the normal exam finding was "consistent with the history provided, and that it does not negate the possibility of prior sexual abuse."

The prosecutor asked Hiday, based on her background, training, and experience in conducting over 1,000 of the same type of sexual assault exams, how many sexual assault exams with reports of abuse occurring more than 72 hours before the exam resulted in

9

"so-called normal exams" with no injuries. Hiday answered 97 percent. With reports of more recent abuse, Hiday noted that "[m]ore than 80 percent still have a normal exam." Hiday explained that female genitalia are composed of a specific type of tissue that "heals very quickly."

VI.     *Testimony of Doe V.*

Doe V. was 25 years old when she testified at trial. Araceli married Leslie when Doe V. was eight or nine years old. Doe V. testified that Leslie sexually abused her when she was between 11 and 16 years old, and she described the abuse in detail. She described incidents in which he licked her vagina, digitally penetrated her vagina, had her rub his penis, and had her orally copulate him, which she said happened "a lot." Leslie first penetrated her vagina with his penis when she was 12, and he continued to do it until she was 16. He penetrated her anus with his penis twice, once when she was 13 and once when she was 15.

Leslie sometimes physically pinned Doe V. down, hit her face, or put his hands around her neck and applied pressure. She attempted to fight back but never succeeded.

After the first incident of vaginal penetration, Doe V. cried, and Leslie told her that he would kill her if she told anyone. He thereafter repeatedly threatened that he would kill her if she told anyone, and he said that he would make it look like she committed suicide. Doe V. feared Leslie and believed Leslie's threats, because he physically abused her every day or every other day by hitting her with a "spiked belt" and

10

his hand. Marcus confirmed that before he moved out of the house in 2012 he saw Leslie physically hit or hurt Doe V. and Doe C.

When Doe V. was 16 years old, she confronted Leslie about the abuse. He sexually abused her only one more time after that, when she was 18 years old. She also moved out of the house when she was 18. She did not tell anyone about the abuse because she did not think that anyone would believe her. Doe V. said that once when she was 11 or 12 years old Araceli walked in on her orally copulating Leslie in the living room. Araceli later told Doe V. that Leslie "was drinking" and "[i]t wasn't supposed to be that way." Doe V. never talked to Araceli about that incident again. At trial, Araceli denied that she ever saw Leslie sexually abusing any of the children. When Doe V. moved out, Araceli did not report the abuse because she did not know if "something could still be done."

VII.    *Child sexual abuse accommodation syndrome*

At trial, Dr. Veronica Thomas, Ph.D., a clinical and forensic psychologist, testified for the prosecution. Thomas did not have any information about the case or the parties. She testified about child sexual abuse accommodation syndrome (CSAAS), which she described as "a way of explaining abuse that happened between people that know each other." She cautioned that CSAAS is not a diagnostic tool used to determine whether a child has been abused. Thomas opined that "[o]nly ten percent of sexual assaults have physical findings," so it is important to consider the context of the relationship between the victim and the abuser to understand the victim's disclosure of abuse. CSAAS has five

11

components: (1) secrecy, (2) helplessness, (3) entrapment/accommodation, (4) delayed and discrepant disclosure, and (5) recantation or retraction.

Regarding delayed disclosure, Thomas explained that a victim might be reluctant to disclose abuse because "there's usually no physical evidence of inappropriate sexual relationship." She also explained that a victim might first disclose sexual abuse when talking about other issues, such as physical abuse. In that context, she commented that "most people who are sexually abused don't really tell anybody." The prosecutor asked Thomas how "violence in the household" would affect delayed and discrepant disclosure, and Thomas answered in part, "So where there's violence the likelihood increases that there's inappropriate sexual conduct."

VIII. *The verdict and the sentence*

The jury convicted Leslie of all of the charged sex offenses and found true all six of the one strike allegations. The jury also found Leslie guilty of all of the remaining offenses except assault on a peace officer. The trial court sentenced Leslie to 223 years four months to life in state prison, composed of consecutive sentences of 15 years to life for 13 of the sex offense counts, 25 years to life for the remaining sex offense count in which a multiple-victim one strike allegation was found true, the midterm of two years for evading law enforcement, eight months (one-third the midterm) for resisting arrest, and eight months (one-third the midterm) for purchasing or receiving a firearm while subject to a protective order.

12

I.  *Section 954*

Leslie contends that his trial counsel rendered ineffective assistance by not moving under section 954 to sever the trial on the firearm offense. We disagree, because the record does not contain a declaration from Leslie's trial counsel and there is a rational explanation for the failure to request severance.

To demonstrate ineffective assistance of counsel, Leslie "'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165; *Strickland v. Washington* (1984) 466 U.S. 668, 687.) "On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.'" (*Johnsen*, at p. 1165.) If "'counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*Ibid.*)

"Section 954 allows for the joint trial of 'two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 275.) "The law favors the joinder of counts because such a course of action promotes efficiency." (*People v.*

13

*Merriman* (2014) 60 Cal.4th 1, 37.)  A trial court nevertheless "has discretion to order that properly joined charges be tried separately."  (*Ibid.*; § 954.)

The record does not contain any information about why Leslie's counsel did not move to sever the trial on count 18.  Leslie contends that there is no conceivable tactical reason for the omission because of the significant prejudicial impact that evidence of the firearm offense would have on the trial of the sex offenses.  And he contends that counsel's error was prejudicial because the evidence of the firearms and the criminal protective order tended to show that Leslie was a person with a "bad character for violence" who was the type of person that surrounded himself with deadly weapons.

The argument fails because Leslie's trial counsel could have reasonably concluded that the benefit of introducing the firearm evidence outweighed any possible prejudice.  After Doe C. confronted Leslie about the sexual abuse and Araceli took both Doe C. and Doe M. to her friend's home and refused to communicate with Leslie, he fled when approached by law enforcement.  The jury could reasonably infer that Leslie's flight from law enforcement was strong evidence of his consciousness of guilt of sexually abusing Doe C.  (*People v. Hill* (1967) 67 Cal.2d 105, 120 [evidence of flight has no probative value except that "it may demonstrate consciousness of guilt"].)  The jury was instructed that it could draw that inference:  "If the defendant fled or tried to flee after he was accused of committing the crime, that conduct may show that he was aware of his guilt."  And such evidence could be particularly significant because there was no physical evidence corroborating Doe C.'s and Doe V.'s accounts of the sexual abuse.

14

Evidence that Leslie possessed firearms in violation of a protective order, however, provided the jury with an alternative explanation of why Leslie fled from law enforcement. That is, the jury could infer that his flight showed consciousness of guilt of the firearm offense, not of the sexual offenses. Moreover, counsel could have rationally concluded that introduction of the firearm and protective order evidence was unlikely to prejudice Leslie, for at least two reasons. First, the record already contained ample evidence that Leslie was violent. Doe C., Doe V., and Marcus all testified that Leslie physically abused both Doe C. and Doe V. Doe C. also testified that Leslie physically abused Marcus and Doe M. Doe V. testified that Leslie repeatedly threatened to kill her. And Araceli's friend testified that when Leslie was parked in front of her house, everyone was afraid because Araceli believed that Leslie had firearms with him. Leslie does not argue that any of that evidence would have been excluded if the firearm count had been severed. Second, the evidence concerning the sexual offenses was far more inflammatory than the evidence concerning the firearm offense.[1] For all of these reasons, Leslie's

---

[1] Leslie's trial counsel argued in closing that there was no evidence that Leslie was aware that the firearm was in the car when he fled from law enforcement. At oral argument on appeal, Leslie argued that his trial counsel's closing argument demonstrates that counsel had no tactical reason for not moving to sever and that counsel did not choose not to make that motion on the ground that he believed introduction of the evidence would benefit Leslie. We are not persuaded. First, the decision not to request severance would have been made before trial, when counsel could have reasonably concluded that introduction of the firearm evidence was beneficial for the reasons already explained. Counsel could have later chosen a different strategy after observing how the evidence unfolded at trial. Counsel's closing argument thus does show that there was no conceivable tactical reason *before trial* for counsel to have made the decision not to request severance of the firearm offense. Second, trial counsel could have reasonably concluded that introduction of the firearm offense evidence would allow him to proceed

*[footnote continued on next page]*

counsel could have rationally concluded that the benefit from introduction of the firearm and protective order evidence (i.e., providing an alternative explanation for Leslie's flight from law enforcement) outweighed the risk of any prejudicial effect.

Because there is at least one conceivable tactical reason why defense counsel did not move to sever the trial on the firearm count, Leslie has failed to show that counsel's omission constituted ineffective assistance. (*Johnsen*, *supra*, 10 Cal.5th at p. 1165.)

## II. *Alleged evidentiary errors*

Leslie contends that the trial court abused its discretion by admitting certain portions of the testimony of both Thomas and Hiday and that the admission prejudiced him. The arguments lack merit.

### A. *Standard of review*

We generally review for abuse of discretion any ruling on the admissibility of evidence (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 389), including "decisions regarding the admissibility of expert testimony" (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*)).

### B. *CSAAS*

Leslie contends that the trial court abused its discretion by admitting the following portions of Thomas's testimony: (1) CSAAS is "a way of explaining abuse that happened between people that know each other"; (2) "[M]ost people who are sexually

_____

on alternative theories of the case. If the jury did not believe the primary argument that Leslie did not know that the firearm was in the car, then the jury could reasonably infer that there was an alternate explanation for Leslie's flight from the scene, namely, his consciousness of guilt of the firearm offense (rather than the sex offenses).

abused don't really tell anybody"; and (3) "So where there's violence [in the household] the likelihood increases that there's inappropriate sexual conduct." He challenges the first portion of the testimony on the ground that it goes beyond the scope of permissible CSAAS testimony. He challenges the remaining two portions on the ground that they constitute impermissible profile evidence. The arguments have no merit.

Evidence Code section 801 permits expert testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (§ 801, subd. (a).) "Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.'" (*Sedano*, *supra*, 88 Cal.App.5th at p. 479; *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175 (*Lapenias*).) "CSAAS testimony is permitted '"to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,"' such as delayed disclosure of the abuse. [Citations.] An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.'" (*Sedano*, at p. 479.) CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)

"A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*People v. Prince* (2007) 40 Cal.4th 1179, 1226 (*Prince*); *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084 (*Robbie*).) "Profile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt." (*People v. Smith* (2005) 35 Cal.4th 334, 358 (*Smith*), disapproved on another ground by *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670.) "'Profile evidence,' however, is not a separate ground for excluding evidence; such evidence is inadmissible only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Smith*, at p. 357.)

Regarding Thomas's description of CSAAS as "a way of explaining abuse that happened between people that know each other," Leslie argues that the testimony impermissibly "assumed the truth of the accusations by the daughter and step-daughter against Leslie" and thus "went beyond simply 'dispelling commonly held myths or misconceptions about child sexual abuse.'" We disagree.

The challenged testimony merely provides a generalized description of what CSAAS is. Nothing about the explanation strayed beyond the permissible rehabilitative, myth-dispelling function of CSAAS testimony. By testifying that CSAAS is a tool for explaining the conduct of a sexual abuse victim who knows the perpetrator, Thomas did not in any way suggest that Leslie was guilty of sexually abusing Doe V. and Doe C. On

18

the contrary, Thomas testified that she knew nothing about the case or the parties. She did not vouch for Doe C.'s or Doe V.'s credibility by defining CSAAS, and she did not imply that the sexual abuse actually happened because Leslie knew Doe C. and Doe V. She merely defined CSAAS and provided context to the jury to understand the circumstances in which it is generally applicable. She did not offer any opinion as to whether it applied in the present case or whether Doe C. or Doe V. had been sexually abused. Leslie's argument challenging the admissibility of this testimony therefore fails.

Leslie's argument concerning profile evidence fares no better. As the Supreme Court explained in *Smith*, evidence is not subject to exclusion merely because it constitutes profile evidence. (*Smith*, *supra*, 35 Cal.4th at p. 357.) Rather, profile evidence is inadmissible only "if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Ibid.*) Leslie contends in his opening brief that Thomas's testimony that "violence occurs where there is no sexual abuse and people who are not abused also do not tell anybody they were abused" conveyed "improper generalizations without any foundation" and that were "as consistent with innocence as with guilt." Leslie does not provide any legal analysis or citation to authority supporting the conclusory assertion that the evidence lacked foundation, so the undeveloped argument is forfeited. (*People v. Vaca* (2023) 89 Cal.App.5th 1113, 1122, fn. 7.) And Leslie does not argue that the testimony was irrelevant or more prejudicial than probative. The argument challenging Thomas's testimony on the ground that it constitutes impermissible

19

profile evidence consequently fails, because classifying testimony as profile evidence does not establish its inadmissibility. (*Smith*, at p. 357.)

In any event, the challenged testimony was not profile evidence. First, in testifying that most child sexual abuse victims do not report the abuse, Thomas did not compare any conduct of Leslie's to a typical pattern or profile of a sexual abuser and conclude that he fit the profile. (*Prince*, *supra*, 40 Cal.4th at p. 1226.) The testimony had nothing to do with Leslie's behavior. Thomas was merely describing disclosure patterns of child sexual abuse *victims*, including delayed disclosure, which is a central component of CSAAS. Such evidence "is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting— is inconsistent with his or her testimony claiming molestation.'" (*Sedano*, *supra*, 88 Cal.App.5th at p. 479.)

Second, Thomas's testimony that the likelihood of inappropriate sexual conduct increases if there is violence in a household also does not constitute profile evidence. Thomas was not answering hypothetical questions that incorporated the victims' description of Leslie's conduct—that is, the specific ways in which the children alleged that Leslie inflicted violence on them. (Cf. *Robbie*, *supra*, 92 Cal.App.4th at p. 1084.) Nor did she evaluate Leslie's specific conduct against a pattern or profile or opine that Leslie fit it. (*Prince*, *supra*, 40 Cal.4th at p. 1226.) Thomas did not relate her testimony about violence in the household to Leslie or his alleged conduct at all. (*Ibid.*) Instead, she provided the jurors with general information about the types of behaviors that often

precede or are correlated with childhood sexual abuse and how those behaviors commonly affect how victims report the abuse. That does not constitute profile evidence.

For these reasons, we conclude that the trial court did not abuse its discretion by admitting the challenged portions of Thomas's testimony.

C. *Statistical evidence*

Leslie argues that the following statistical evidence lacked adequate foundation: (1) Thomas's testimony that "only ten percent of sexual assaults have physical findings"; (2) Thomas's testimony that "there's usually no physical evidence of inappropriate sexual contact"; (3) Hiday's testimony that 97 percent of sexual assault examinations involving reports of historical sexual abuse result in normal findings; and (4) Hiday's testimony that more than 80 percent of sexual assault examinations involving reports of recent abuse result in normal findings. The arguments lack merit.

An expert may generally base their opinion on any "matter" known to them, including otherwise inadmissible hearsay, which may reasonably be relied upon for that purpose. (Evid. Code, § 801, subd. (b).) "Of course, any material that forms the basis of an expert's opinion testimony must be reliable." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported

21

by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.)

Hiday's testimony concerning the frequency of normal findings in sexual assault examinations was supported by an adequate foundation. Hiday testified that her opinion was based on her background, training, and experience, which included having performed over 1,000 sexual assault examinations of the same type that she performed on Doe C. Hiday was well-qualified as a forensic pediatric nurse practitioner, with years of experience in her job. In addition, she participated in an ongoing forensic peer review process in which she and others reviewed other medical professional's cases and current studies and literature on the topic. Hiday's education, training, and experience provide a more than adequate foundation for her opinion concerning the percentage of sexual assault exams that produce normal findings. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 949 ["A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable"].)

Leslie argues that the foundation for the statistics was inadequate because there was no information about the types of sexual assaults included within the sample, such as whether the examinations included reports of inappropriate touching, oral copulation, "violent rape," or "confirmed assaults." Leslie does not explain why such information was necessary or how its absence rendered the testimony unsupported by an adequate foundation. No such information was necessary to support the admissibility of the testimony in question. Rather, Leslie's argument raises issues that his trial counsel could

22

have explored on cross-examination.  But those issues do not show that Hiday's

testimony concerning the percent of sexual assault exams that produce normal findings

lacked foundation.  Hiday's extensive education, training, and experience provided more

than adequate foundation for that testimony.

Relying on *People v. Julian* (2019) 34 Cal.App.5th 878 and *Lapenias*, Leslie also

argues that the statistical testimony of both Hiday and Thomas "was analogous to

impermissible statistical testimony that relates 'either qualitatively, or with specific

statistics or percentages—to the infrequency with which children make false allegations

of sexual abuse.'"  We disagree.  In *Lapenias* and *Julian*, the CSAAS experts testified

that victims rarely make false allegations of child sexual abuse.  (*Lapenias*, *supra*, 67

Cal.App.5th at p. 178; *Julian*, at p. 885.)  In *Julian*, the expert testified that false

allegations of child sexual abuse happen "'about as low as one percent of cases to a high

of maybe 6, 7, 8 percent.'"  (*Julian*, at p. 883, italics omitted.)  In *Lapenias*, the expert

testified that it was "'rare for kids to make a false claim of sexual abuse.'"  (*Lapenias*, at

p. 177.)  The Courts of Appeal concluded that the "'predictive conclusions'" about

whether "alleged child abuse victims 'should be believed'" went "beyond the scope of

CSAAS evidence and may confuse the jury," and the testimony "invited jurors to

presume [the defendants were] guilty based on statistical probabilities, and not decide the

evidence properly introduced in the case."  (*Julian*, at p. 886; *Lapenias*, at p. 179.)

*Lapenias* added that the "testimony—by implication and by inference—violated the

general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Lapenias*, at p. 179.)

The challenged statistics in the present case are unlike those in *Julian* and *Lapenias*. They "are not statistics that improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do." (*Sedano*, *supra*, 88 Cal.App.5th at p. 481.) Hiday's testimony merely explained that normal sexual assault examination findings can be consistent with abuse. She did not suggest that the lack of physical findings means that abuse necessarily or likely occurred. The testimony could assist the jury in assessing Doe C.'s credibility. Hiday did not convey any "statistics that 'plac[e] a thumb on the scale *for guilt*.'" (*Ibid.*) Moreover, Thomas's testimony about the lack of physical findings explained why child sexual assault victims do not immediately report the abuse, thus dispelling a common myth and misconception that delayed reporting tends to undermine credibility. "This is precisely what CSAAS testimony is meant to do." (*Ibid.*)

In sum, Leslie has not articulated a meritorious argument for the exclusion of Hiday's testimony concerning the frequency of normal findings in child sexual assault examinations or Thomas's testimony about how infrequently there are physical findings of sexual abuse in child sexual abuse cases.

III.    *Prosecutorial misconduct*

Leslie argues that the prosecutor committed misconduct during closing argument by improperly attempting to shift the burden of proof by telling the jury "that after all the

24

evidence was presented to you, that presumption [of innocence] is gone." The argument is both forfeited and meritless.

A.    *Closing argument*

The trial court instructed the jury as follows on the burden of proof: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each and every essential element of a charge beyond a reasonable doubt."

The prosecutor remarked during rebuttal: "As we talked about in jury selection, 100 percent, the People have the burden of proof. We talked about that at the beginning there is a presumption of innocence. Again, this is before you heard all the evidence.

"Way back then when we did jury selection, I told you, everyone agreed because it's the truth, that as the defendant was sitting there back then, however many weeks ago when the trial started, as he was sitting there he was presumed to be innocent.

"Well, a lot has changed since then. You've seen and heard the evidence. The words that [defense counsel] keeps on referring to. Yes, you heard from [Doe V. and Doe C.] They told you what the defendant did to them.

"And I submit to you that *after all the evidence was presented to you, that presumption is gone*. It hasn't been rebutted. It has been proven beyond a reasonable doubt that the defendant is guilty of the charges." (Italics added.)

Defense counsel did not object to the prosecutor's statements.

25

B.      *Legal framework*

"A defendant is presumed innocent until proven guilty, and the government has the burden to prove guilt, beyond a reasonable doubt, as to each element of each charged offense." (*People v. Booker* (2011) 51 Cal.4th 141, 185 (*Booker*).) "The presumption of innocence is a fundamental component of a fair trial under our system of criminal justice." (*People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159 (*Cowan*).) "The presumption of innocence continues during the taking of testimony and during jury deliberations until the jury reaches a verdict." (*Ibid.*)

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"'" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) "'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.'" (*Ibid.*) "When a claim of misconduct is based on the prosecutor's comments before the jury, '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*Ibid.*) "It is improper for the prosecutor to misstate the law, and in particular to attempt to reduce the People's burden of proof beyond a reasonable doubt." (*Cowan*, *supra*, 8 Cal.App.5th at p. 1159.)

C.      *Analysis*

The People contend that Leslie forfeited the argument that the prosecutor committed misconduct in closing argument, and we agree.  In general, a criminal """"defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.""""  (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)  Defense counsel did not object to the prosecutor's argument that the presumption of innocence was "gone" after the evidence was presented, so the argument is forfeited.  (*Ibid.*)  We address the argument in any event, because Leslie argues that his counsel rendered ineffective assistance by failing to object.

Leslie fails to demonstrate that his trial counsel's performance fell below an objective standard of reasonableness.  The prosecutor's argument is similar to an argument that the Supreme Court has held did not constitute misconduct.  (*Booker*, *supra*, 51 Cal.4th at p. 183.)  In *Booker*, the prosecutor told the jury:  "'I had the burden of proof when this trial started to prove the defendant guilty beyond a reasonable doubt, and that is still my burden.  It's all on the prosecution.  I'm the prosecutor.  That's my job. [¶] The defendant was presumed innocent until the contrary was shown.  That presumption should have left many days ago.  He doesn't stay presumed innocent.'"  (*Ibid.*)

The Supreme Court concluded that the prosecutor's remarks did not lessen the People's burden of proof by implying that the defendant was not entitled to be presumed innocent.  (*Booker*, *supra*, 51 Cal.4th at p. 185.)  In reaching that conclusion, the court

27

adopted the following reasoning from *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189-190: "'Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt.'" (*Booker*, at p. 185.) *Booker* added that although the Supreme Court does "not condone statements that appear to shift the burden of proof onto a defendant (as a defendant is entitled to the presumption of innocence until the contrary is found by the jury), the prosecutor here simply argued the jury should return a verdict in his favor based on the state of the evidence presented." (*Ibid.*)

The prosecutor's argument in the present case, "that after all the evidence was presented to you, that presumption [of innocence] is gone," is the same type of argument approved in *Booker*. As in *Booker*, the prosecutor tied his argument that the presumption of innocence was "gone" to the state of the evidence, claiming that the presumption had been overcome by the evidence presented at trial. (*Booker*, *supra*, 51 Cal.4th at p. 185.) The prosecutor thus argued that the People carried their burden of proving Leslie's guilt beyond a reasonable doubt by presenting evidence that overcame the presumption of innocence. (*People v. Panah* (2005) 35 Cal.4th 395, 463; *People v. Romo* (2016) 248 Cal.App.4th 682, 693.) That "amounted to proper argument that the evidence proved [Leslie's] guilt beyond a reasonable doubt." (*People v. Jones* (2024) 106 Cal.App.5th 1085, 1101.)

28

Leslie argues that the prosecutor's remarks are more akin to those in *Cowan*, in which the appellate court concluded that a prosecutor's comments during closing argument constituted misconduct as "an unfair attempt to lighten the prosecution's burden of proof." (*Cowan*, *supra*, 8 Cal.App.5th at p. 1160.) In *Cowan*, the prosecutor "told the jury that the presumption of innocence is in place 'only when the charges are read' and that the 'presumption is gone' thereafter." (*Id.* at p. 1159.) *Cowan* reasoned that the prosecutor's statements were dissimilar to those in *Booker*, because the prosecutor's argument was not tied to the evidence that had been presented but instead told the jury that "the presumption of innocence disappears" "even before the evidence is received." (*Ibid.*)

The prosecutor's remarks in the present case are not like those in *Cowan*. The prosecutor in this case did not suggest that the presumption of innocence ended before the evidence was presented but rather told the jury given all of the evidence admitted at trial, the presumption was gone, i.e., it had been overcome.

For these reasons, we conclude that the prosecutor's argument concerning the presumption of innocence did not constitute misconduct. Leslie's counsel therefore did not perform deficiently by failing to object. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

29

IV.    *The firearm count*

    A.    *Instructional error*

Section 29825(a) provides that "[a] person who purchases or receives, or attempts to purchase or receive, a firearm knowing that the person is prohibited from doing so" by certain types of court orders "is guilty of a public offense" punishable by imprisonment in county jail or state prison.  Subdivision (b) of section 29825 prohibits "own[ing] or possess[ing] a firearm" while knowing that it is prohibited by the same orders listed in section 29825(a).

The amended information alleged that Leslie violated section 29825(a) as a prohibited person who had purchased or received a firearm.  The trial court instructed the jury orally and in writing with CALCRIM No. 2512 that Leslie was charged in count 18 "with unlawfully possessing a firearm in violation of Penal Code section 29825."  The instruction provided that in order to find Leslie guilty of the offense the jury had to find that Leslie "possessed a firearm" and "knew that he possessed the firearm."  In the verdict form, the jury found Leslie "guilty of the crime of P.C. § 29825(a), purchase or receive firearm with temp restraining order, protective order or injunction, as charged in Court 18."  (Capitalization omitted.)

Leslie contends that his conviction on count 18 must be reversed because the trial court prejudicially erred by not instructing the jury on the elements of purchasing or receiving a firearm as a prohibited person under section 29825(a).  The People concede the error and that it was prejudicial, and we agree.  The trial court erred by instructing the

30

jury on the elements of a different offense, namely, subdivision (b) of section 29825. The error is not harmless. We cannot conclude beyond a reasonable doubt that the jury would have convicted Leslie of the charged offense under section 29825(a) if it had been properly instructed. (*People v. Hayes* (2009) 171 Cal.App.4th 549, 560 ["An instruction that omits or removes an element of an offense from consideration by the jury may be harmless if the error is harmless beyond a reasonable doubt"]; *Chapman v. California* (1967) 386 U.S. 18, 24.) We accordingly reverse Leslie's conviction on count 18.

B.      *Sufficiency of the evidence*

Leslie also contends that there was insufficient evidence to support a conviction under section 29825(a) for the purchase or receipt of a firearm while subject to a protective order. We agree. We address Leslie's challenge to "the sufficiency of the evidence on this count, because the double jeopardy clause precludes retrial if the evidence is insufficient." (*People v. Grant* (2003) 113 Cal.App.4th 579, 584.)

For the jury to convict Leslie under section 29825(a), it had to find beyond a reasonable doubt that: (1) Leslie purchased or received a firearm, (2) Leslie knew he purchased or received a firearm, (3) a court order prohibited him from purchasing or receiving firearms, and (4) Leslie knew of the court's order. (CALCRIM No. 2512.)

"In reviewing a sufficiency of the evidence claim, our role is limited. We review the entire record to determine whether it discloses reasonable and credible evidence to allow a rational trier of fact to determine guilt beyond a reasonable doubt." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 119, fn. 11.)

31

The record contains no evidence that Leslie either purchased or received any firearm when Leslie was prohibited from doing so by a protective order.  Neither Shuler nor Araceli testified about when Leslie either purchased or received either of the firearms found in his vehicle.  But section 29825(a) requires that the defendant purchase or receive the firearm while knowing that doing so is prohibited by a court order.  Given that there was no evidence having any tendency to show when Leslie purchased or received either firearm, the jury could not have reasonably excluded the possibility that he purchased or received them before the protective order was entered.

For the foregoing reasons, there was insufficient evidence to support a conviction under section 29825(a).  Leslie therefore cannot be retried on that count.

V.      *Cumulative error*

Leslie also argues that the cumulative effect of the alleged errors deprived him of his constitutional right to a fair trial.  It is possible for several individually harmless errors to constitute prejudicial error when considered in the aggregate.  (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.)  We have identified only one error, however, so the doctrine of cumulative prejudice does not apply.

DISPOSITION

The conviction on count 18 is reversed.  In all other respects, the judgment is affirmed.  The trial court is directed to (1) prepare an amended sentencing minute order and amended abstract of judgment reflecting the reversal of the conviction on count 18

and (2) transmit a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.