Filed 2/5/26  P. v. Barron CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B328972 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. KA123877 |
| v. | |
| LARRY DARNELL BARRON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David C. Brougham, Judge.  Sentence vacated; remanded with instructions.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Xiomara Costello and Nancy Lii Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Larry Darnell Barron of the first degree murder of Luis Padilla, assault with a firearm on Martha Padilla, the attempted robberies of Luis and Martha, the robberies of Freddy Gamino and Eduardo Cruz, and being a felon in possession of a firearm. On appeal, Barron contends the prosecutor committed misconduct in his closing argument and the trial court abused its discretion in denying his *Romero* motion.[1] Barron also argues the court should have exercised its discretion to strike or dismiss one or more of his firearm enhancements.

We reject Barron's claim of prosecutorial misconduct and find no abuse of discretion in the denial of his *Romero* motion. However, we vacate his sentence and remand the matter for further proceedings on the firearm enhancements under Penal Code section 1385, subdivision (c).[2]

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The robberies and shooting*

Around 9:20 p.m. on January 3, 2020, Eduardo Cruz was outside his apartment complex in Pomona. His friend Freddy Gamino was with him. Cruz saw a group of six or seven African American men yelling at a Hispanic man who had come into the complex. One of the African American men "came at" Cruz and Gamino. He was thin with tattoos and braids. He was carrying a handgun, and he hit Cruz on the forehead with it, yelling, " 'What hood are you from?' "

---

[1]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

[2]     References to statutes are to the Penal Code.

2

The man told Cruz "[t]o bring out everything that [he] had." Cruz took the keys to his truck and some money out of his pockets and handed it over to the man. The man then went toward Gamino. He pointed the gun at Gamino's head and pulled the trigger, but "[t]he bullet did not come out." The man took Gamino's wallet.

Martha Padilla Serbin and her son Luis were in the courtyard of the apartment complex at about the same time. They were collecting cans from the dumpster. Martha saw about six Black men "hitting a guy." Two of the Black men then approached Martha and Luis. One of them had "[v]ery curly" shoulder-length hair. He was wearing a red hat.

The man asked Martha if she'd "taken any photos or videos of him." He demanded her cell phone. He was yelling; he put the gun to Martha's forehead "[s]everal times." He hit her "[h]ard" with the gun and punched her in the stomach.

The man felt the outside of Martha's jacket pockets. He "started to threaten [her] that he was going to kill [her] son." The man called Martha a "bitch" and a "motherfucker." He aimed his gun at Luis's head and said, "Boom." The man searched Luis's pockets.

Luis told the man not to harm them—"[t]hat we were not doing anything to him." In Spanish, Martha told the man not to harm her or her son. The man replied, " 'Don't speak Spanish, bitch.' " The man pushed Luis and Luis fell to his knees. Luis asked him not to shoot. The man put the gun to Luis's head and asked Martha if she "wanted to see how he was going to kill [her] son, bitch." Then he "went again boom," and then "made some signal with his fingers that he was from a very dangerous gang."

3

Martha hugged Luis so the man would shoot her instead of Luis.  Martha "wanted to hug him and put [her] body right next to his butt," but "[e]verything happened so quickly and [she] wasn't able to."  Martha heard a gunshot and both she and Luis "fell to the side."  Luis was shot.  Martha also was shot in her right hand.  The men "took off running."

Police and paramedics arrived quickly.

Luis had been shot in the back.  He never regained consciousness.  Luis died on December 1, 2020.  He was 26 years old.  The cause of death was "complications of [a] remote gunshot wound to the back."

About a week after the shooting, Detective Alex Nguyen stopped a car with five people in it.  Barron was the front passenger.  Barron had curly hair and was wearing a red beanie cap.  Behind the front passenger seat, Nguyen found a loaded, unregistered Smith & Wesson 9-millimeter semiautomatic handgun.  Testing showed the bullet that struck Luis was fired from that handgun.

Body damage to the car Nguyen stopped appeared to be the same body damage seen in surveillance video from a security camera at Cruz's apartment complex of a car leaving the scene of the shooting.

Cruz identified Barron in a photo six-pack.  At trial, Martha identified Barron as the man who shot her and her son Luis.

## 2.    *The charges, trial, verdicts, and sentence*

The People charged Barron with the attempted murder of Luis (count 1), the attempted murder of Martha (count 2), the robberies of Gamino and Cruz (counts 3 and 4, respectively), possession of a firearm by a felon (count 5), and the attempted

4

robberies of Luis and Martha (counts 6 and 7, respectively). In counts 1 and 2, the People alleged Barron personally used and personally and intentionally discharged a firearm causing great bodily injury or death. In counts 3 and 4, the People alleged Barron personally used a firearm. The People also alleged Barron had two prior strikes.[3]

After Luis died, the prosecution amended count 1 to allege murder.

The case went to trial in September 2022. On the felon-with-a-gun count, Barron stipulated he had a felony conviction, so the jury was told only that. Barron chose not to testify.

The jury found Barron guilty on counts 1 (finding the murder to be in the first degree), 3, 4, 5, 6, and 7. On count 2, the jury convicted Barron of the lesser offense of assault with a firearm on Martha.[4] The jury also found all of the firearm allegations true. Barron waived jury on his strike priors and, in a bench trial, the court found true the allegation that Barron had suffered two prior strikes.

---

[3] In the information filed in October 2020, the People named Timothy Lee Wright as a co-defendant. As to both defendants, the People alleged gang allegations on all counts, and "principal" firearm allegations on counts 6 and 7. On September 16, 2022, the court severed Wright's trial on the prosecution's motion. On the same date, the prosecution announced "unable to proceed" on the gang enhancements and related firearm allegations based on the passage of Assembly Bill No. 333.

[4] The jury was unable to reach a unanimous verdict on the attempted murder charge in count 2. At that juncture, the prosecution moved to dismiss the attempted murder charge, and to accept the verdict on the lesser charge.

The trial court denied Barron's oral motions for a new trial and to strike his strikes under *Romero.* The court sentenced Barron to 199 years to life calculated as follows: On count 1 (murder of Luis) 25 to life, tripled under the Three Strikes law, plus 25 to life for the firearm; on count 2 (assault with a firearm on Martha) 25 to life plus the midterm of four years for the firearm; on counts 3 and 4 (robberies of Gamino and Cruz, respectively) 25 to life plus 10 years for the firearm; on count 5 (felon with a gun) the midterm of two years doubled; and on counts 6 and 7 (attempted robberies of Luis and Martha, respectively) 25 to life plus 10 years for the gun. The court ordered the sentences on counts 1, 2, 3, and 4 to run consecutively to one another. The court ordered the sentences on counts 5 and 7 to be served concurrently, and the sentence on count 6 to be stayed.

## DISCUSSION

1. ***The prosecutor's rebuttal argument in closing did not constitute misconduct, nor has Barron shown prejudice***

a. *Barron's contentions*

Barron contends the prosecutor's closing argument in rebuttal—after defense counsel had presented his closing—constituted misconduct so egregious as to render his convictions a denial of due process. We disagree.

Barron complains the prosecutor's reference to Martha as "a phenomenal witness" was impermissible vouching, and his statements to the jury that she'd had to go through "[t]he seventh layer of hell" was an impermissible appeal for sympathy. The prosecutor referred to his own mother and his wife, and noted "mothers are a different breed." The prosecutor continued,

6

> "The pain of losing her son is one thing, but the cycle that she goes through every single night . . . . What if I put my hand here? What if I . . . dove in front of him? What if I saved him? . . . And she recalls and reiterates that every single night in her head."

The prosecutor added, "The simple fact of the matter is she goes to that dark place and she relived it for you and you saw it. It was genuine in every regard."

Barron also contends the prosecutor's argument about Cruz was an appeal for jurors' sympathy. The prosecutor talked about "events" that are "terrible" that a person "will forever remember." The prosecutor then said,

> "I'm talking about . . . Eduardo Cruz. I'm talking about the grown man, hardworking dude that works at a welding shop that comes in here and relives that event on that witness stand for you. That he came in here with tears in his eyes remembering the day that he thought he was going to die."

Barron's counsel did not object to any of these arguments. Barron argues his attorney was ineffective in failing to object.

b.      *Governing law*

" ' "[A] prosecutor is given wide latitude to vigorously argue his or her case." ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480 (*Rodriguez*). See also *People v. Seumanu* (2015) 61 Cal.4th 1293, 1330 (*Seumanu*) [criminal prosecutor has much latitude when making a closing argument].) "The rules are well settled." (*Seumanu*, at p. 1330.) A prosecutor's argument "may be strongly worded and vigorous so long as it fairly comments on

7

the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence." (*Ibid.*, citing *People v. Ward* (2005) 36 Cal.4th 186, 215. See also *People v. Ghobrial* (2018) 5 Cal.5th 250, 289 [prosecutors are granted wide latitude during arguments, and are permitted to draw from matters not in evidence that are common knowledge or illustrations drawn from common experience].) So long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the facts of the record and the inferences reasonably drawn from those facts—rather than any personal knowledge or belief—his comments do not constitute improper vouching. (*People v. Bonilla* (2007) 41 Cal.4th 313, 337.)

A prosecutor commits misconduct, however, when his conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact. A defendant who attacks the prosecutor's remarks to the jury must show that, in the context of the whole argument and the instructions, there was a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657; see also *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1159; *People v. Henderson* (2020) 46 Cal.App.5th 533, 548.) Courts do not lightly infer that a jury is likely to have understood the prosecutor's argument in the most damaging sense. (*Seumanu*, *supra*, 61 Cal.4th at p. 1337; see also *People v. Centeno* (2014) 60 Cal.4th 659, 667.) As a reviewing court, we must consider the challenged statements in the context of

8

the argument as a whole to make our determination. (*Cowan*, at p. 1159.)

      c.    *No reversible error*

As noted, Barron's counsel did not object to any of the arguments by the prosecutor that he now complains of, nor did he ask the court to admonish the jury. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*Seumanu*, *supra*, 61 Cal.4th at p. 1328; *People v. Pearson* (2013) 56 Cal.4th 393, 426.) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.)

Anticipating the forfeiture problem he faces, Barron argues his attorney's failure to object to the prosecutor's statements was constitutionally deficient. To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate both that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) If the record on direct appeal sheds no light on why counsel acted or failed to act, a reviewing court must reject an ineffective assistance of counsel claim unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

Here, defense counsel could have had valid reasons to refrain from objecting. Martha, who testified through an interpreter, was a grieving mother whose son had been shot to death while she literally held him in her arms. Cruz, who also testified through an interpreter, was a reluctant witness. It's difficult to tell from the proverbial "cold record," but he seemed to be uncomfortable with having to testify. Defense counsel may well have believed objecting to the prosecutor's comments about these vulnerable victim witnesses would not be well received by the jurors.

In any event, even if we were to overlook Barron's failure to preserve the issue and address its merits, we would find no prejudicial error. The prosecutor's reference to Cruz as a "hardworking dude that works at a welding shop" was not improper. Cruz testified he'd just come home from work, after 9:00 at night. While the record doesn't indicate whether Cruz had "tears in his eyes" when he testified, the following exchange with the prosecutor did take place:

> "Q: Mr. Cruz, when you had the gun at your forehead and the man was asking you to take everything out of your pockets, how did you feel at that time?
> "A: That that was it for me.
> "Q: Did you think you were going to die?
> "A: Yes."

As for Martha, the prosecutor's reference to her as "a phenomenal witness" did not constitute impermissible vouching. " 'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of

experience, or the prestige or reputation of the office, in support of the argument.' " (*Rodriguez*, *supra*, 9 Cal.5th at p. 480. See also *Seumanu*, *supra*, 61 Cal.4th at p. 1329 [personal assurances of the witness's veracity may constitute vouching].) But prosecutorial assurances, " '*based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper "vouching," which usually involves an attempt to bolster a witness by reference to facts *outside* the record.' " (*People v. Williams*, *supra*, 16 Cal.4th at p. 257. See also *People v. Boyette* (2002) 29 Cal.4th 381, 433 [prosecutor may properly argue witness is telling the truth based on the circumstances of the case]; *Rodriguez*, at p. 483 [prosecutor may make assurances regarding apparent honesty or reliability of witness based on facts of the record and inferences reasonably drawn from them].) The prosecutor here never suggested he knew Martha personally or that facts outside the record bore on her credibility.

As for eliciting sympathy, the prosecutor's comments about Martha going through a "cycle" every night of whether she could have saved Luis presents a closer question. Prosecutors are not permitted to give the equivalent of a victim impact statement to the jury. But here, the prosecutor's argument was based on the evidence admitted at trial, permissible inferences from that evidence, and common experience. Martha testified she "hugged [her] son" so Barron would shoot her instead. She told the jury, "I wanted to hug him and put my body right next to his butt," but "[e]verything happened so quickly and I wasn't able to." The prosecutor's argument that Martha would "relive" the shooting, wondering if she could have done anything differently to save

11

Luis, was a scenario that would be a "common experience" for a parent who had lost a child to violence.[5]

Moreover, the prosecutor's statements about Cruz and Martha came after defense counsel had questioned the reliability of their testimony in his closing argument. Defense counsel told the jury, "I do believe that grief and the trauma that Ms. Padilla went through clouded her memory." He continued, "Everything that she remembered, she added on to make it as traumatic and scary as it was for her when she was going through it that night." Counsel questioned both witnesses' identification of "the man" as Barron. When a defense attorney questions the credibility or reliability of a witness, the prosecutor is permitted to respond; he may make assurances based on the facts of the record and reasonable inferences from those facts. (*People v. Redd* (2010) 48 Cal.4th 691, 740.)

Finally, any error is harmless in any event. The record contains "overwhelming evidence" of Barron's guilt. (See *People v. Roberts* (2021) 65 Cal.App.5th 469, 480.) The 9-millimeter pistol he later admitted was his was the weapon used to shoot Luis. In his second interview with detectives, Barron admitted having been at the scene and having pointed his gun at Martha (though—as discussed below—he continued to claim he didn't know how the gun went off).

---

[5] The prosecutor's mention of his own mother and his wife, while perhaps unwise, did not exceed the limits of permissible argument. He did not go beyond the mere mention of their existence to suggest, for example, how they would feel if their child were killed.

**2.** ***The trial court did not abuse its discretion in denying Barron's*** Romero ***motion***

a. *Barron's motion and the court's ruling*

In the information, the People alleged Barron had suffered two prior strikes, one in 2014 for first degree burglary and one in 2006 involving a gang enhancement. Barron waived jury on the priors and the court conducted a bench trial. At the beginning of the court trial, the prosecution clarified that the 2006 strike prior was a conviction for possession of a firearm by a felon, with a gang enhancement. After reviewing prison packets from the California Department of Corrections and Rehabilitation, the court found the two strike priors to be true.

On the date set for sentencing, the court asked Barron's counsel, "You are making an oral motion under People versus Romero to strike one or more of those strike convictions; is that correct?" Counsel replied, "Yes, Your Honor." Counsel argued, "The base terms of the charges for which Mr. Barron was convicted carry life and are high enough to protect the public and to satisfy the victim's family that Mr. Barron is paying a serious price for the loss of their loved one's life." Counsel asked the court to "exercise [its] discretion under Penal Code 1385," and to strike Barron's strikes and "sentence him on the base terms."

Apparently in anticipation of the defense's oral *Romero* motion, the prosecution had filed a written opposition to any request to "strike a strike." Citing Barron's criminal history, laid out in the probation report, the prosecutor argued, "A chronology of Barron's adult criminal offenses and incarcerations shows that he is the archetype violent offender who should be punished under the Three Strikes Law with a severely long prison sentence."

13

The court acknowledged it had "discretion to strike the strikes" under *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*). The court noted the factors *Williams* instructed trial courts to consider. The court detailed Barron's criminal history, including a 2004 car theft; a 2005 conviction for possession of a firearm by a felon, carrying a loaded firearm, and possession of narcotics while armed; a 2006 conviction, again for possessing a firearm as a felon and participating in a criminal street gang, resulting in a four year prison sentence; a 2011 conviction for auto theft and possession of narcotics in prison, resulting in a three year prison sentence; and a 2014 conviction for first degree burglary, resulting in a six year prison sentence. The court stated Barron was paroled in 2019. He committed the crimes in this case at the beginning of the next year.[6]

The court then ruled: "[W]hen I examine all the factors cited in Romero, as well as other information about him gleaned from the probation report, and the People's motion and from the trial record, Mr. Barron seems to squarely fall within the parameters of the Three-Strikes Law with a very strong dedication to life as a career criminal." The court denied the motion and proceeded to sentence Barron.

b. *Governing law*

"[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero, supra,* 13 Cal.4th at p. 528.) The law "does not offer a discretionary sentencing

---

[6] According to the probation report, Barron was released from prison in April 2018 and discharged from parole on April 23, 2019. He committed the crimes in this case on January 3, 2020, fewer than nine months later.

choice . . . but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike," unless the court concludes it should make an exception to the scheme because—" 'for articulable reasons [that] can withstand scrutiny for abuse' "—the " 'defendant should be treated as though he actually fell outside the Three Strikes scheme.' " (*People v. Strong* (2001) 87 Cal.App.4th 328, 337–338 (*Strong*).)

"Consistent with the language of and the legislative intent behind the three strikes law," our Supreme Court has "established stringent standards that sentencing courts must follow in order to find such an exception." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).) The law "not only establishes a sentencing norm[;] it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so." (*Id*. at p. 378.) The court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra,* 17 Cal.4th at p. 161.) A court's "great power" to dismiss a prior strike conviction should be used only in " 'extraordinary' circumstances, when the ends of justice demand it." (*People v. Mayfield* (2020) 50 Cal.App.5th 1096, 1105.)

We review a trial court's decision to dismiss or not to dismiss a strike prior for abuse of discretion. (*Carmony, supra,* 33 Cal.4th at pp. 371, 374–375.)

15

c.   *No abuse of discretion*

The trial court here acted well within its discretion in denying Barron's motion to dismiss his strikes.  The "nature and circumstances" of Barron's January 2020 crimes exhibited a callous disregard for human life.  Barron put his gun to Martha's forehead, hit her hard with it, and punched her in the stomach.  He then pushed her son Luis, who fell to his knees, aimed his gun at Luis's head, threatened to kill him, and said "Boom."  Barron then shot both Luis and Martha as Martha wrapped her arms around her son to try to protect him by shielding him with her body.  Barron also used his gun to rob Cruz and Gamino, even attempting to fire his gun at Gamino's head.

The record does not reveal the facts of Barron's prior strikes.  We know, however, that one of them was first degree burglary.  First degree burglary carries a high risk of violence should the intruder and the property owner happen upon each other.  (See *Magness v. Superior Court* (2012) 54 Cal.4th 270, 275 [burglary laws recognize " ' "the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence" ' "].)[7]

---

[7]   The Attorney General asserts this conviction was for a violent felony, citing section 667.5, subdivision (c)(21).  The Attorney General is mistaken.  First degree burglary is a violent felony if another person (other than an accomplice) was present in the residence.  Otherwise, first degree burglary is a serious felony only.  (Pen. Code, §§ 667.5, subd. (c)(21), 1192.7, subd. (c)(18).)  Nothing in the record indicates a "person present" allegation was made, admitted, or proved in Barron's 2014 burglary case.

16

The other strike involved possession of a firearm, as did another of Barron's felony convictions.  The strike offense also included an enhancement of active participation in a criminal street gang under section 186.22, subdivision (a).  Barron committed his first felony offense at age 18, and by the time he shot the victims in this case at age 33, he had convictions for a number of felonies, resulting in prison terms of three, four, and six years.

Barron contends "[h]is priors were not violent."  Strictly speaking, that's correct.  One might quibble, however, with the notion that a convicted felon who carries a loaded firearm and illegally possesses ammunition (Barron's 2005 crimes), or a convicted felon who possesses a firearm while actively participating in a criminal street gang (Barron's 2006 crime), does not pose a risk to public safety.  Moreover, that a majority of a defendant's priors were nonviolent "cannot, in and of itself, take [him] outside the spirit of the Three Strikes law when the defendant is a career criminal with a long and continuous criminal history." (*Strong*, *supra*, 87 Cal.App.4th at p. 345.)

Barron also says he "expressed remorse at what happened" when police interviewed him.  "Expressing remorse at what happened" is not the same as saying, "I'm sorry I shot the victims."  In his first interview with detectives, Barron repeatedly, and vigorously, denied having been at the scene or involved in any way in the robberies and shooting.  In a second interview three days later, Barron admitted having been there and having had his 9-millimeter Smith & Wesson "on" him.

Barron told the detectives a "confrontation" with "two guys" "turned into" "a little light-weight scuffle."  Barron admitted he "[drew] down" on Martha but claimed "she hit the gun" and

17

"made [Barron] fire it off."  Barron said, "[S]he must've hit the motherfucka, it went off."

Later in the interview, Barron told the detectives, "I'm willing to accept it.  I'm hurt, but I'm trying to stay strong, too ass well [*sic*], but tell his family I really apologize, and all this happened over nonsense.  Tell 'em, you know what I'm saying, I apologize and whatever—whatever the consequences mean, Imma accept it."  Barron reiterated, "I don't know, like, I don't even know how the gun went off, honestly. . . .  I don't know if she, like, hit it, but it went off.  And she ended up getting shot."[8]

In sum, there is nothing favorable to Barron in his current or prior convictions or his background, character, or prospects. (Cf. *Williams*, *supra*, 17 Cal.4th at pp. 162–164 [defendant's DUI conviction followed three similar convictions; record "devoid of mitigation" related to priors; in 13 years since prior strike defendant often in prison or jail]; *People v. Vasquez* (2021) 72 Cal.App.5th 374, 387 ["there are no extraordinary circumstances in [the] record—none—that would mitigate against the application of the Three Strikes law"]; *People v. Beasley* (2022) 81 Cal.App.5th 495, 502 [same].)

---

[8]    As the Attorney General notes, when the prosecutor read a victim impact statement from Luis's cousin at the sentencing, in which the family member recounted the family's vigil while Luis lay in the hospital for months, Barron exclaimed, "The hospital killed him.  What are you talking about?"  The court admonished Barron.  When the prosecutor read the family member's statement that "Some days were good.  Some days weren't," Barron again spoke out:  "That's some bullshit.  He said—motherfucker.  What the fuck?"

18

### 3. *Remand is appropriate for the trial court to consider whether to dismiss any of Barron's firearm enhancements under section 1385, subdivision (c)*

Barron contends the court did not consider dismissing any of his four firearm enhancements under section 1385, subdivision (c). Barron acknowledges his counsel didn't ask the court to dismiss any of the enhancements, and he contends his attorney was constitutionally ineffective in that failure. The Attorney General contends Barron has forfeited the issue. We exercise our discretion to consider the issue nevertheless, to resolve Barron's ineffective assistance of counsel claim.

Trial courts have discretion to strike or dismiss firearm enhancements "in the interest of justice" under section 1385. (§ 12022.5, subd. (c).) Section 1385 states "the court shall dismiss an enhancement if it is in the furtherance of justice to do so." (§ 1385, subd. (c)(1).)

Effective January 1, 2022, section 1385, subdivision (c)(2), states sentencing courts "shall consider and afford great weight to evidence offered by the defendant to prove" certain enumerated mitigating circumstances, and "[p]roof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." Of the nine mitigating circumstances listed in the statute, the only one that conceivably applies to Barron is subparagraph (B): that "[m]ultiple enhancements are alleged in a single case." (§ 1385, subd. (c)(2)(B).) Subparagraph (B) provides, "In this instance, all enhancements beyond a single enhancement shall be dismissed." (*Ibid.*)

The presence of an enumerated mitigating circumstance does not create a presumption in favor of dismissal. (*People v. Walker* (2024) 16 Cal.5th 1024, 1032–1033 (*Walker*).) Instead, "absent a finding that dismissal would endanger public safety, a court must assign significant value to the enumerated mitigating circumstances when they are present. In practice, the presence of an enumerated mitigating circumstance will generally result in the dismissal of an enhancement unless the sentencing court finds substantial, credible evidence of countervailing factors that 'may nonetheless neutralize even the great weight of the mitigating circumstance, such that dismissal of the enhancement is not in furtherance of justice.' " (*Id.* at p. 1038.)

However, "[s]ection 1385(c) does not mean that, whenever a listed mitigating circumstance is present, the trial court must dismiss all enhancements unless it finds dismissal would endanger public safety. The California Supreme Court has explained that, even without 'a finding that dismissal would endanger public safety,' the trial 'court retains the discretion to impose or dismiss enhancements provided that it assigns significant value' to the presence of any listed mitigating circumstances." (*People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157, quoting *Walker*, *supra*, 16 Cal.5th at p. 1029.)

Here, the trial court imposed four firearm enhancements, one for each of the crimes against the four victims. The record contains no discussion of whether dismissal of any of the four enhancements would endanger public safety, or of the factors listed in the California Rules of Court.[9] In short, we can't tell

---

[9]     When considering whether to strike a firearm enhancement, a trial court considers the same factors considered

whether the court considered the requirements of section 1385, as amended by Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1). Remand therefore is necessary. We of course offer no views on how the court should rule on any request by counsel to dismiss or strike one or more of Barron's firearm enhancements.

## DISPOSITION

Larry Darnell Barron's sentence is vacated and the matter is remanded for further proceedings in accordance with section 1385, subdivision (c). Barron's convictions otherwise are affirmed.


## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


EGERTON, J.

We concur:


EDMON, P. J.


ADAMS, J.

---

when handing down a sentence in the first instance. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 497. See Cal. Rules of Court, rules 4.410, 4.421, 4.423, 4.428(b).)